# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND, NORTHERN DISTRICT

PATRICIA CLAUDE,                          )
                                          )
               Plaintiff,             )          Case No.:  JFM-022511
                                          )
v.                                        )
                                          )
HARBOR HOSPITAL CENTER,                   )
                                          )
               Defendant.             )
_____/

## MEMORANDUM BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Bruce S. Harrison
Fiona W. Ong
SHAWE & ROSENTHAL, LLP
20 S. Charles St., 11th Floor
Baltimore, MD 21201
Telephone:  (410) 752-1040
Facsimile:  (410) 752-8861

Attorneys for Defendant

August 7, 2003

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS .....................................2

        A.      Admitting and Registration Department .......................................2

        B.      Harbor Hospital Policies and Procedures ....................................3

        C.      Plaintiff's Employment History .................................................5

III.    ARGUMENT ........................................................................................19

        A.      Standards for Summary Judgment .............................................19

        B.      Plaintiff's § 1981 Claim Must Fail ...........................................20

                1.      The Legal Standards Applicable to § 1981 .........................21

                2.      Plaintiff's Harassment Claim Is Without Basis ...................22

                        a.      Plaintiff cannot establish a *prima facie* ...................*22*
                                case of discrimination

                        b.      Plaintiff cannot establish a *prima facie* ...................23
                                case of retaliation

                3.      Plaintiff's Termination Claim Is Without Basis ..................25

                        a.      Plaintiff cannot establish a *prima facie* ...................25
                                case of discriminatory discharge.

                        b.      Plaintiff cannot establish a *prima facie* ...................*27*
                                case of retaliatory discharge.

                4.      Plaintiff Cannot Demonstrate Pretext ...............................28

        C.      Plaintiff's Intentional Infliction of Emotional Distress ................31
                Claim Must Fail

IV.     CONCLUSION ........................................................................................33

# TABLE OF AUTHORITIES

**Page**

## Statutes and Rules

42 U.S.C. § 2000e-3(a) ................................................................24

Fed. R. Civ. P. 56 ......................................................................19

## Case Law

*Adams v. Giant Food, Inc.,* 225 F. Supp. 2d 600 ..........................................23,24
(D. Md. 2002) (Motz, J.)

*Anderson v. Liberty Lobby Inc.,* 477 U.S. 242 (1986) ...................................19

*Batson v. Shiflett,* 325 Md. 684 (1992) ....................................................32

*Beye v. Bureau of National Affairs,* 59 Md. App. 642 ..................................31
*cert. denied,* 301 Md. 639 (Ct. Spec. App. 1984)

*Booker v. Brown & Williamson Tobacco Co.,* ...........................................24
879 F.2d 1304 (6th Cir. 1989)

*Blair v. Colonnas Shipyard, Inc.,* 52 F. Supp. 2d 687 ..................................26
(E.D. Va. 1999), *aff'd,* 203 F.3d 810 (4th Cir. 2000)

*Brinkley v. Harbour Recreation Club,* 180 F.3d 598 (4th Cir. 1999) .............20

*Bryant v. Bell Atlantic Maryland, Inc.,* 288 F.3d 124 (4th Cir. 2002) ............21

*Causey v. Balog,* 162 F.3d 795 (4th Cir. 1998) .......................................20,28

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...........................................19

*Collier v. Ram Partners, Inc.,* 159 F. Supp. 2d 889 (D. Md. 2001) ................32

*Continental Casualty Co. v. Mirabile,* 52 Md. App. 387, ............................31
*cert. denied,* 294 Md. 652 (Ct. Spec. App. 1982)

*Conner v. Schnuck Mkts., Inc.,* 121 F.3d 1390 (10th Cir. 1997) ...................28

*Connor v. Giant Food, Inc.,* 187 F. Supp. 2d 494 (D. Md. 2002) (Motz, J.) .................20,30,31

*Cook v. CSX Transportation Co.,* 988 F.3d 507 (4th Cir. 2002) ...................23

*DeJarnette v. Corning Inc.*, 133 F.3d 293 (4th Cir. 1998) ..............................26,29

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, ......................................21
53 F.3d 55 (4th Cir. 1995)

*Etefia v. East Baltimore Comm'y Corp.*, 2 F. Supp. 2d 751 ............................32
(D. Md. 1998)

*Halperin v. Abacus Tech. Corp.*, 128 F.3d 191 (4th Cir. 1997) .....................21

*Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46 (Ct. Spec. App. 1986) ...............31

*Harris v. Jones*, 281 Md. 560 (Md. 1977) .......................................................31

*Hopkins v. Baltimore Gas & Elec.*, 77 F.3d 745 (4th Cir. 1996) ....................21,23

*King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003) ...........................................28,31

*Laughlin v. Metropolitan Washington Airports Authority*, ...........................24
149 F.3d 253 (4th Cir. 1998)

*Lujan v. Nat'l. Wildlife Federation*, 497 U.S. 871 (1990) ............................19

*Mathews v. Giant Food, Inc.*, 187 F. Supp. 2d 486 ....................................23,27
(D. Md. 2002) (Motz, J.)

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, ..............................19
475 U.S. 574 (1986)

*Mitchell v. Data General Corp.*, 12 F.3d 1310 (4th Cir. 1993) .....................19

*Morrow v. Farrell*, 187 F. Supp. 2d. 548 (D. Md.), ...................................20,27
aff'd 2002 U.S.App. Lexis 23716 (4th Cir. 2002)

*Mungro v. Giant Food, Inc.*, 187 F. Supp. 2d 518 ....................................20,21,25,
(D. Md. 2002) (Motz, J.)...........................................................................26,27,29

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ..................................22

*Texas Dep't of Community Affairs v. Burdine*, ...........................................22
450 U.S. 248 (1983)

*VanDevander v. St. Mary's County Sheriff's Ofc.*, ......................................28
2001 U.S. Dist. LEXIS 7080 * 29 (D. Md. 2001)

**UNITED STATES DISTRICT COURT**
**FOR DISTRICT OF MARYLAND, NORTHERN DISTRICT**

PATRICIA CLAUDE,                          )
                                          )
          Plaintiff,                      )          Case No.:  JFM-022511
                                          )
v.                                        )
                                          )
HARBOR HOSPITAL CENTER,                   )
                                          )
          Defendant.                      )
_____ /

**MEMORANDUM BRIEF IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

This case involves a Harbor Hospital Patient Registrar who was terminated for a serious safety error – her admitted mislabeling of a patient chart, less than three weeks after she had been previously disciplined for and warned against making that very same error.  Apparently of the view that her best defense from her clear misconduct is to attempt to muddy the waters, she now raises a plethora of claims that the Hospital's actions in terminating her and in disciplining her for multiple patient complaints constituted race discrimination and retaliation in violation of 42 U.S.C. § 1981 and intentional infliction of emotional distress.  As discussed below, no probative evidence supports those contentions.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Admitting and Registration Department

Plaintiff Patricia Claude was employed in Harbor Hospital's Admitting and Registration Department as a Patient Registrar.  The Department Manager is Carol Lupinos.  Lupinos Depo.[1] at 4.  There are two department supervisors, Lucy White and Tim Shetterly, who report to Ms. Lupinos and who supervise the approximately 35 Patient Registrars.  *Id.* at 4, 20.  Approximately one-half of the Patient Registrars are African-American.  *Id*. at 21.

The job duties of a Patient Registrar are to obtain information (e.g. name, birthday, social security number, address, insurance information, next of kin, referrals) from patients as soon as they arrived at the Hospital and input that information into a database.  Claude Depo.[2] at 35, 40-41.  They then print labels with each patient's identification information, to be placed on the patient chart or given to the patient for lab tests that they will undergo.  *Id.* at 42.

There are two types of patient registrations (admissions) that are handled by Patient Registrars at Harbor Hospital.  One is "private outpatient" (individuals who are at the Hospital on an outpatient basis), and the other is "admissions" (individuals admitted on an inpatient basis).  Claude Depo. at 37.  The registration process for both types of patient registrations is generally the same, with a few different screens based on the type of insurance information for each patient.  Claude Depo. at 79; White Depo.[3] at 25.  Several years ago, all of the Patient Registrars were cross-trained to handle both types of patient registrations.  Claude Depo. at 38; Lupinos Depo. at 8.

---

[1]  Excerpts from the deposition of Carol Lupinos are attached as Exhibit 1.
[2]  Excerpts from the deposition of Patricia Claude are attached as Exhibit 2.

Most of the Patient Registrars are located in the Admissions area, with a few assigned to specific departments elsewhere in the Hospital, including the Imaging (or X-ray) Department. Lupinos Affidavit at ¶¶ 3-4 (attached as Exhibit 4).  In such cases, however, they still are members of the Admitting and Registration Department and report to the supervisors in that department.  Lupinos Aff. at ¶ 4.  The supervisors and Department Manager are located in the Admissions area.  Lupinos Aff. at ¶ 5.

**B.    Harbor Hospital Policies and Procedures**

Harbor Hospital has a number of policies concerning employee conduct and discipline. Lawyer Depo.[4] at 6-7.

The Code of Conduct has been issued to all employees, including Plaintiff, who sign an acknowledgement of receipt form.  Lawyer Depo. at 9; Claude Depo. at 68.  Among other things, the Code of Conduct contains policies on Equal Employment Opportunity and Harassment, and non-retaliation for raising complaints.  Lawyer Depo. at 11; Code of Conduct excerpts, attached as Exhibit 6.  Plaintiff testified that she received and understood the Code of Conduct.  Claude Depo. at 68-69.

The Human Resources Policy Manual contains policies on Standards of Behavior, Corrective Action, Grievance Resolution, Equal Opportunity, and Harassment Prevention. Policy Manual excerpts, attached as Exhibit 7.

---

[3]  Excerpts from the deposition of Lucy White are attached as Exhibit 3.
[4]  Excerpts from the deposition of Darlene Lawyer are attached as Exhibit 5.

The Standards of Behavior policy provides for discipline for certain behavior, including written warnings, suspension, and termination. *Id*. The policy further provides that the levels of discipline "are guidelines and not an enforceable commitment." *Id*.; Hoffman Depo.[5] at 14-16.

Consistent with that flexibility, the Corrective Action policy also provides that, in choosing the appropriate corrective action, the supervisor will consider "the nature and severity of the incident" and "the employee's previous corrective actions, if any." Policy Manual excerpts; Hoffman Depo. at 14-16; Lawyer Depo. at 19. Thus, a supervisor could and should exercise discretion over the level of discipline imposed, taking into account the employee's disciplinary record, how hard the employee is trying, and the employee's overall work attitude. Lawyer Depo. at 25. Before a manager issues disciplinary action, he/she must first consult with Human Resources, which retains similar discretion. White Depo. at 28; Shetterly Depo.[6] at 50-51; Lawyer Depo. at 6, 27.

In addition to the policies described above, there is an employee handbook, which is given to all employees. White Depo. at 29; Claude Depo. at 87. The handbook contains an EEO policy/harassment policy, a grievance policy, and a corrective action policy. Handbook excerpts, attached as Exhibit 10. Plaintiff acknowledges that she received the handbook when it was distributed in 1995 and again in 2001. Claude Depo. at 87. Her written acknowledgement states that she agreed to read the handbook carefully, and she testified that she was familiar with the handbook. Claude Depo. at 87-88.

---

[5] Excerpts from the deposition of Dawn Hoffman are attached as Exhibit 8
[6] Excerpts from the deposition of Timothy Shetterly are attached as Exhibit 9.

C.    **Plaintiff's Employment History**

Plaintiff was initially employed as a Patient Registrar in the Admitting and Registration Department of Harbor Hospital in 1988, the position she held at the time of her termination. White Depo. at 3; Claude Depo. at 34, 37.  She was assigned to the X-ray department in 1989 or 1990.  Claude Depo. at 36.  Ms. White was her supervisor.  White Depo. at 6.

In 2000, a patient survey was conducted in the X-ray department.  The department manager, Joe Zilox, informed Ms. White that a number of patients had complained that Plaintiff had been rude to them.  White Depo. at 5-7; Patient Surveys, attached as Exhibit 11.[7]  Plaintiff admits that patients were upset with her, but attributes this to their having to wait for her to serve them because she was so busy.  Claude Depo. at 46-47.  She acknowledges, however, that Mr. Zilox might well have felt that she unnecessarily caused this patient concern.  Claude Depo. at 49.

Ms. White verbally counseled Plaintiff about the complaints.  White Depo. at 7; Claude Depo. at 62.  In addition, in Plaintiff's April 1, 1999 – March 31, 2000 performance evaluation, which covered the time period of the survey, she received an "unsatisfactory" score of 1.5 (out of 3) for "Customer Service," with the comment that, "PAT NEEDS TO WORK ON CUSTOMER SERVICE SKILLS AS WE HAVE HAD SOME COMPLAINTS."  White Depo. at 48-49 (emphasis in original); Claude April 1, 1999 – March 31, 2000 Performance Assessment, attached as Exhibit 12.  Plaintiff also received an unsatisfactory score of 1.5 for "Problem

---

[7]  The surveys do not identify Plaintiff by name, but rather refer to the registration clerk. Plaintiff, however, was the only Registrar assigned to the X-ray department during the period of time in question.  Lawyer Depo. at 40.

Solving/Decision Making," with the comment that, "Pat needs to work on alternative solutions when presented with a registration problem."  White Depo. at 49-50; Claude April 1, 1999 – March 31, 2000 Performance Assessment.  In the "Employee's Comments" section of the evaluation form, Plaintiff, while denying having done anything wrong, stated, "Will most definitely try to work harder on my customer service skills."  Claude April 1, 1999 – March 31, 2000 Performance Assessment.  Significantly, Plaintiff admits that the unsatisfactory ratings that she received, which were based on the patient complaints, did not have anything to do with her race.  Claude Depo. at 66-67.

As a result of these expressions of patient dissatisfaction, Plaintiff was transferred from the X-ray department to the Admissions area.  White Depo. at 23; Claude Depo. at 49.  This allowed for closer supervision of Plaintiff, since Ms. White could observe what the employees in the Admissions area were doing.  White Depo. at 6, 44-45.  During this time, Ms. White observed no problems with Plaintiff's performance.  White Depo. at 6.

After approximately six months in Admissions, Plaintiff requested a transfer back to the X-ray department, which was granted.  White Depo. at 23-24.  In the summer of 2001, Plaintiff was transferred to Mr. Shetterly's supervision as part of a departmental reorganization.  Claude Depo. at 73; White Depo. at 51.  She still worked in the X-ray department, and her job duties did not change.  Claude Depo. at 73.  She did not see Mr. Shetterly at all while she worked in X-Ray.  Claude Depo. at 76.  Plaintiff states that, as a supervisor, Mr. Shetterly expected more than Ms. White.  Claude Depo. at 75.  During this time, Plaintiff attended several training sessions, including one on customer service.  Claude Depo. at 69-70.

In the fall of 2001, Plaintiff was informed by her physician that she needed a hysterectomy.  Claude Depo. at 17-18.  In addition, Plaintiff found a lump in her breast, which also required surgery.  Claude Depo. at 19.  Plaintiff was scared by this because of a family history of cancer, including breast cancer.  Claude Depo. at 218, 219.

On October 15, 2001, a mother and grandmother of a pediatric patient complained to the department that Plaintiff was angry and rude towards them during the registration process. Shetterly Depo. at 29.  Mr. Shetterly followed up on this complaint by speaking with the mother and grandmother on the date of the incident.  Shetterly Depo. at 29-30, 37.  He also spoke with Plaintiff, who denied the claims made about her conduct.  Shetterly Depo. at 34.  Perhaps recognizing her accountability for this incident, Plaintiff stated that she had just heard that something was found on her ultrasound, and that she was not smiling.  Letter re: 10/15/01, attached as Exhibit 13.  She also stated that the patient's grandmother said "You look mad," to which she responded "I'm not mad a little upset maybe but not mad."  Letter re: 10/15/01; Claude Depo. at 146-48.  .Mr. Shetterly verbally counseled Plaintiff, but did not issue any formal discipline.  Shetterly Depo. at 29, 32, 40.

On October 17,[8] the mother of another pediatric patient complained to the director of the EKG department that Plaintiff had been rude and argumentative over whether a referral was required for services.  Shetterly Depo. at 9, 39-40.  The director reported the complaint to Mr.

---

[8]  There is a minor disagreement with regard to the dates of one incident.  Although Plaintiff signed the disciplinary notice issued on October 17, she does not have a specific recollection of an incident on this day.  She does have a specific recollection of an incident on October 2, for which the Hospital has no record.  This dispute is not material, however, as both parties agree that there were four patient complaints, Claude Depo. at 103, and there is no dispute about the dates of the other three complaints.

Shetterly, who spoke with the mother in person.  Shetterly Depo. at 10-11.  Mr. Shetterly also

spoke with Plaintiff.  Shetterly Depo. at 13-14.  Mr. Shetterly then spoke with Human Resources,

advising that he had concluded that Plaintiff had been at fault.  Lawyer Depo. at 6.

Because of her poor customer service, and the fact that she had had another patient

complaint only two days previously, it was decided to discipline Plaintiff by giving her a verbal

warning.  (The fact that a verbal warning has been issued is documented in an employee's file).

Shetterly Depo. at 14-17; Claude Verbal Warning, attached as Exhibit 14.  Mr. Shetterly stated

that Plaintiff did not follow the customer service protocols on which she had received training,

including two training sessions during the time that she reported to him.  Shetterly Depo. at 16-

17.  Plaintiff signed the notice of verbal warning.  Claude Verbal Warning.  The warning

described the two incidents on October 15 and 17, and warned her, "You are expected to display

immediate and ongoing improvement in the quality of service you provide your customers and

family.  If no immediate improvement is seen further progressive corrective action will occur

inclusive of termination."  Claude Verbal Warning.

As a result of the foregoing events and circumstances, the decision was made to transfer

Plaintiff back to the Admissions area, to perform both inpatient and outpatient admissions.

Letter re: 10/15/01; Lupinos Aff. at ¶ 7; Claude Depo. at 79.  In this way, she could be directly

supervised by Ms. Lupinos and Mr. Shetterly.  Lupinos Aff. at ¶ 7.

According to Ms. Claude, although she was familiar with outpatient admissions, and with

some of the screens in the inpatient admissions process, there were several admissions screens to

which she had not previously been exposed.  Claude Depo. at 79.  She received two days of

training, but did not think it was enough.  Claude Depo. at 81-82.  Plaintiff stated that other

Registrars received more training, but then she admitted that was simply an assumption on her part.  Further, she could not identify anyone who might have received more training.  Claude Depo. at 86.

Only two weeks after her reassignment (on November 2, 2001), there was yet another patient complaint about Plaintiff.  In this instance, a patient complained to Human Resources that Plaintiff had made him use his own phone to call his physician's office.  Shetterly Depo. at 41-42.  Plaintiff should have allowed him to use the department phone.  *Id*.  Mr. Shetterly interviewed the patient on the day of the incident, and also discussed the incident with Plaintiff.  Shetterly Depo. at 41-42.

After consultation with Human Resources, the decision was made to issue a First Written Warning.  Shetterly Depo. at 51; 11/2/01 Claude First Written Warning, attached as Exhibit 15.  The warning reviewed the patient complaints from October 15 and 17, as well as the November 2 complaint, and reiterated the same warning as the Verbal Warning, quoted above.  11/2/01 Claude First Written Warning.  This time, Plaintiff refused to sign the warning.  *Id*.; Claude Depo. at 143-44.

After the first incident in October, Plaintiff had spoken to Ms. Lupinos and Mr. Shetterly, allegedly stating that she felt "racial tones" in the patient's complaint.  Claude Depo. at 54, 90-91, 124-25.   Ms. Lupinos' response to Plaintiff was, "Well, maybe you're a little too professional."  Claude Depo. at 55.  When Plaintiff asked her what that meant, Ms. Lupinos explained, "Well, maybe it's your body language" or "the way people perceive you."  Claude Depo. at 55-56.  This was the only time that Plaintiff ostensibly spoke to Ms. Lupinos or Mr.

Shetterly about even the probability that race played a role in the patient complaints made about her. Claude Depo. at 118.

Plaintiff alleges that she made a similar statement about the patient's "racial tones" to Darlene Lawyer, a Human Resources Generalist. Claude Depo. at 120-21; Lawyer Depo. at 16. In addition, Plaintiff alleges that she spoke with the Vice President of Harbor Hospital, Debbie Kephart, and indicated that the patients "had racial tones towards me." Claude Depo. at 90-91, 138, 140. In her deposition, Plaintiff initially also claimed that she complained to Ms. Kephart about certain comments allegedly made by Mr. Shetterly, but she retracted this claim when it was pointed out to her that the comments, according to her EEOC charge, could not have taken place until the following Spring. Claude Depo. at 139-41.

Plaintiff considers her October statements about a patient's "racial tones" as "speaking for her civil rights." Claude Depo. at 179-80. She acknowledges that the October statements were the only time that she spoke of her civil rights. Claude Depo. at 180.

Sometime in October or November 2001, Plaintiff submitted written responses to the first three patient complaints, which she characterizes as documenting "everything that had transpired from October 2." Claude Depo. at 30, 114-14. She states that she made an effort to be as complete and as accurate as possible in those letters. Claude Depo. at 115-16. None of the letters, however, stated or suggested that race discrimination played a role in what was said and/or done by the complaining patients or her supervisors. Letter re: 10/15/01; Letter re: 10/2/01, attached as Exhibit 16; Letter re: 11/2/01, attached as Exhibit 17. While the letter regarding the 10/15/01 incident states that "I would like to continue to work here without being harassed or humiliated for something I had not done," Plaintiff testified that she meant by this

12

patients "fabricating issues" concerning her, and Mr. Shetterly believing the patients.  Letter re:

10/15/01; Claude Depo. at 151-52.

After receiving these writings, Ms. Lawyer commenced an investigation into Plaintiff's

concerns.  Lawyer Depo. at 13.  Ms. Lawyer spoke with Mr. Shetterly and his supervisor, Ms.

Lupinos.  Lawyer Depo. at 13.  She also consulted with her supervisor, Assistant Vice President

of Human Resources Dawn Hoffman.  Hoffman Depo. at 8.  Ms. Lawyer explained the patient

complaints and the write-ups, and Ms. Hoffman verified that the corrective action appeared

appropriate based on Hospital policies.  Hoffman Depo. at 8.

On November 27, 2001, Mr. Shetterly conducted a mid-year evaluation, or "Coaching

Phase" for Plaintiff.  Shetterly Depo. at 44.  In the document, which was signed by Plaintiff, Mr.

Shetterly stated, "I would like to see Patricia enhance her customer service skills."  Coaching

Phase, attached as Exhibit 18.

Ironically, on the very next day, November 28, another patient complained about

Plaintiff's rude treatment of her.  Claude Final Warning, attached as Exhibit 19.  The patient

stated that Plaintiff said to her that "You should have never been sent to me," and that "I am

doing an ER admission and I am busy, I cannot help you," before sending the patient back to the

receptionist.  Claude Final Warning.  The Hospital could have terminated Plaintiff's

employment, in accordance with the corrective action policy, for her fourth patient complaint in

a month and a half.  Lupinos Depo. at 26.  Ms. Lupinos was aware, however, that Plaintiff was

about to have surgery, and she took into consideration that Plaintiff might have been stressed

about that event.  Lupinos Depo. at 26-27.  In addition, the Hospital wanted to ensure that

Plaintiff had benefits during her medical leave of absence.  Lupinos Depo. at 26.  Therefore, Ms.

Lupinos made the decision with the concurrence of Human Resources not to terminate Plaintiff. Lupinos Depo. at 26.  Instead, the decision was made to give her a 1-day disciplinary suspension. Shetterly Depo. at 52-53.

Plaintiff came to Ms. Lawyer to complain about the discipline she had received for the most recent patient complaint.  Lawyer Depo. at 17.  According to Ms. Lawyer, Plaintiff stated that Mr. Shetterly was trying to get rid of her.  Ms. Lawyer told her that it was not true, and had that been the case, that she could have been terminated her for as many patient complaints that they had received in such a short period of time.  Lawyer Depo. at 18.  Claude states that Ms. Lawyer said, "Well, originally we told him to fire you, but we didn't want you to go to the OR with that on your mind."  Claude Depo. at 163.  Plaintiff acknowledges that she was not terminated before her surgery or upon her return from medical leave.  Claude Depo. at 163.  She also acknowledges that she was not told that she would be fired when she returned.  Claude Depo. at 164.

While she was on leave, Plaintiff prepared another letter, responding to the November 28 patient complaint.  However, she does not recall if she delivered it to Human Resources or if it went to anyone at the Hospital.  Claude Depo. at 159.  Like the other letters, this one did not claim race discrimination by either the patient or Mr. Shetterly.  Letter re: November 28, 2001, attached as Exhibit 20; Claude Depo. at 158.

With respect to all four incidents, Plaintiff does not deny that patients made the complaints at issue.  Claude Depo. at 146.  Plaintiff also acknowledges that she would expect to be disciplined for legitimate patient complaints.  Claude Depo. at 186-87.  Her argument concerns what the Hospital should have done about these complaints.  Claude Depo. at 147.

14

Further, Plaintiff believes that the patients were racially biased against her.  Claude Depo. at 53-54.  She admits that none of the patients made any racial remark.  Rather, the allegation of racial bias is based simply on her assumption that their treatment of her was due to the color of her skin.  Claude Depo. at 54-55, 149-50; 161-62.  Moreover, Plaintiff professes belief that all four of the patients conspired with each other and with Mr. Shetterly to discriminate against her on the basis of her race.  Again, she admits that she has no proof to support that contention.  Claude Depo. at 162-63.

Plaintiff was aware of the grievance policy.  Claude Depo. at 88.  Plaintiff did not file a grievance with respect to any of the discipline assessed against her for the patient complaints.  Claude Depo. at 164-66.

Plaintiff returned to work in February 2002.  Claude Depo. at 127.  At that time, she requested additional training from Mr. Shetterly, and he instructed another Registrar to work with Plaintiff.  Claude Depo. at 82-83.  When that individual failed to sit with her that day, Plaintiff admits that she did not try to find her or to inform Mr. Shetterly.  Claude Depo. at 85.

Plaintiff alleges that Mr. Shetterly made a number of inappropriate comments to her after she returned from leave.[9]  Amended EEOC Charge of Discrimination, attached as Exhibit 21.

- ■ On one occasion, he allegedly said to her, "So your husband can still go, huh?"  Claude Depo. at 129-30.

- ■ He once allegedly asked her if she knew a drug dealer.  Claude Depo. at 132-33.

---

[9]  The Hospital does not concede that these statements were actually made.  For purposes of summary judgment, however, it will assume that they were made.

- After Mr. Shetterly heard her talk about trying to buy a new house, he allegedly said, "let's see how far her money goes with this." Claude Depo. at 136-37.

- Mr. Shetterly, as Plaintiff contends, also made the following comments about her vehicle: "how can you afford to drive the vehicle," "you have more hardware on the truck than what the truck costs," "how come everybody else's vehicle has salt on it and yours doesn't," and things like that. Claude Depo. at 129. The comments about her vehicle occurred about once a week. Claude Depo. at 133. Plaintiff admits that she added a lot of accessories to her car, and that other people, including the President of the Hospital, commented on her car. Claude Depo. at 134.

Plaintiff never complained about any of these statements at the time that they were ostensibly made. Claude Depo. at 117, 119. Further, Plaintiff admits that Mr. Shetterly never said anything about her race. Claude Depo. at 137. However, she made the assumption that his comments were racially inspired. Claude Depo. at 135, 137. Her sole support for that claim was: "I just felt like because I was black, he felt like I, you know, couldn't afford these things or shouldn't be able to afford these things." Claude Depo. at 137.

On March 13, 2002, Plaintiff made a patient information error during a registration, which resulted in a financial loss to the Hospital. Claude Depo. at 167-68. Because of the financial loss, Plaintiff received a First Written Warning. Claude First Written Warning of 3/13/02, attached as Exhibit 22. Plaintiff does not believe that this discipline was based on her race. Claude Depo. at 169.

**Plaintiff's Labeling Errors**

An error in labeling a patient chart is very serious safety issue for the Hospital.  Lupinos Depo. at 14; Hoffman Depo. at 25.  Plaintiff agrees that mislabeling a patient chart is a serious error.  Claude Depo. at 173, 182-83.  The incorrect patient identification could cause the wrong blood type to be given, patient injury or death.  Lupinos Depo. at 14; Claude Depo. at 173.  In addition to the potential for harm to a patient, the Hospital could be subject to a malpractice suit.  Lupinos Depo. at 14-15.  Because of the serious nature of the error, such an event warrants more severe discipline than a verbal warning.  Lupinos Depo. at 16.

Patient Registrars have the responsibility of ensuring that the patient paperwork is correct before it leaves their hands.  Lupinos Depo. at 11-12.  Plaintiff admits that she was responsible for making sure that she printed out the correct labels for patient charts in the first place, and that it was important to check the labels.  Claude Depo. at 41-43.

Plaintiff labeled patient charts during "the whole 15 years" that she was at the Hospital.  Claude Depo. at 41.  When she worked in the X-ray department, she was the only person printing labels.  Claude Depo. at 43-44.

In the admissions area, however, the 3 or 4 Patient Registrars on duty shared a printer for their labels.  The printer is located in a small room in the back, along with a filing cabinet and desk.  White Depo. at 14, 17.  There is a light in the room, as well as a large window with blinds, which provides plenty of light.  White Depo. at 16.  The Patient Registrars retrieved the labels from the printer and took them back to their desks to place on the patient folders.  White Depo. at 16.

Because of the number of patient labels being printed in the admissions area, Plaintiff admits that she needed to be careful to make sure that she retrieved the right ones. Claude Depo. at 44. This situation was not new to Plaintiff, since she had previously worked in the Admissions area. Claude Depo. at 177.

On March 18, 2002, Plaintiff admits that she made a labeling error. Claude Depo. at 171.[10] Plaintiff's explanation for the error was that the room where the labels printed out was "too dark." Claude Depo. at 175. Plaintiff admits, however, that she could have turned on the light or opened the blinds. Claude Depo. at 175-76. She further testified that, while opening the blinds took time, "it would have been worth it." Claude Depo. at 175-76. She also acknowledges that she was supposed to make sure that the label was correct and if she had checked the label, she would not miss any labeling error. Claude Depo. at 176, 178.

Because of Plaintiff's labeling error, the wrong label was placed on a blood sample that went to the Blood Bank. Lupinos Depo. at 34. If the Blood Bank had not caught the error, the patient would have received the wrong blood type and could have been seriously harmed due to blood incompatibilities. Lupinos Depo. at 34.

Because of the severity of the error, the Hospital issued Plaintiff a Final Written Warning with a two-day suspension. Lupinos Depo. at 34; Final Written Warning, attached as Exhibit 23. Plaintiff was also counseled to pay attention to detail, informed of how critical labeling is, and instructed to verify patient information on the labels. Hoffman Depo. at 23-24.

---

[10] She speculates that someone might have changed the labels, but admits that she does not know for a fact that they did and that it is possible that she incorrectly labeled the chart. Claude Depo. at 171-72.

Plaintiff admits that she was told that she had to be careful about the labels. Claude

Depo. at 173-74. Plaintiff also agrees that she should have been disciplined for the error,

although she believes that she should have received only a verbal warning. Claude Depo. at 176.

She did not file a grievance over this discipline. Claude Depo. at 183.

After this occurrence, Plaintiff filed a charge of discrimination with the EEOC on April 3,

2002. In her charge, Plaintiff alleged retaliation, but not race discrimination. Claude EEOC

Charge of Discrimination, attached as Exhibit 24. She also cited only the discipline that she

received for the patient complaints, and not the labeling error. *Id.*

Approximately three weeks later, Plaintiff once again made a labeling error, to which she

admits. Claude Depo. at 182; Claude EEOC Amended Charge of Discrimination. When Mr.

Shetterly became aware of the second labeling error, he informed Ms. Lupinos about it. Lupinos

Depo. at 5. Ms. Lupinos, in turn, instructed him to speak to Human Resources about the matter.

Lupinos Depo. at 5. Mr. Shetterly spoke with Ms. Lawyer, who then consulted with Ms.

Hoffman as to whether Plaintiff should be terminated. Ms. Hoffman served as the final arbiter

for that decision. Hoffman Depo. at 14. Ms. Hoffman verified that there was not a heavy

volume of patient registrations during that day, so that Plaintiff's error could not be explained by

a hectic pace. Hoffman Depo. at 24.

In accordance with Hospital procedure for employee terminations, Plaintiff's personnel

file was reviewed in evaluating the appropriateness of termination. Lupinos Depo. at 12, 32;

Lawyer Depo. at 46-47. The reason for her termination, however, was the fact that Plaintiff had

twice mislabeled a chart, which could have caused injury to a patient. Lupinos Depo. at 12, 29;

Hoffman Depo. at 15, 23-25; Lawyer Depo. at 34-35, 48-49; Termination decision, attached as

Exhibit 25.  The two labeling errors would have been sufficient reason for termination, even if Plaintiff had had no prior discipline.  Lupinos Aff. at ¶ 8.

During her termination meeting, Plaintiff offered no explanation for her error.  Hoffman Depo. at 24.  Her response was, "What can I say, there are a lot of labels back there."  Hoffman Depo. at 24.

Notably, in her 27 years at the Hospital, Ms. White has never had an employee mislabel a patient file.  White Depo. at 11-12.

Plaintiff received a grievance hearing regarding her termination.  Claude Depo. at 183. She also filed an amended charge of discrimination with the EEOC, in which she alleged retaliation and disability discrimination.  Claude EEOC Amended Charge.  For the first time, Plaintiff raised the alleged statements by Mr. Shetterly, and relied on them as evidence of disability (not race) discrimination.  Claude EEOC Amended Charge; Claude Depo. at 195-96. Plaintiff also alleged that the error was due to a lack of training in her reassigned position. Claude EEOC Amended Charge.  However, she admits that she knew how to label and that the labeling situation when she was reassigned to the main Admissions area was not new to her. Claude Depo. at 41, 177.

After Plaintiff's termination, two other Patient Registrars – Shemeira Cook, who is African-American, and Patricia Gittins, who is white – were both involved in a single mislabeling incident.  Both Ms. Cook and Ms. Gittins received the same discipline – a First Written Warning.  Lupinos Depo. at 15; Hoffman Depo. at 20.  They received a lesser discipline than Plaintiff, because Plaintiff's error was more serious, in that the mislabeling actually reached

the Blood Bank. Lupinos Depo. at 34. They committed no subsequently labeling errors, and since then, no other Patient Registrars have made labeling errors. Lupinos Depo. at 17.

### III.    ARGUMENT

**A.    Standards for Summary Judgment**

Under Fed. R. Civ. P. 56, the moving party is entitled to summary judgment if it can demonstrate that: (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In deciding whether summary judgment is due, the Court "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

If, after viewing the evidence in the light most favorable to the non-moving party, the court finds that the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, the court must grant summary judgment against that party. *Lujan v. Nat'l. Wildlife Federation*, 497 U.S. 871, 888-89 (1990). To avoid summary judgment, the non-moving party must produce evidence that would permit the district court to conclude that a fair-minded jury could not return a verdict for that party on the evidence presented. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 250. In addition, "[c]onclusory

and hearsay evidence does not provide support sufficient to defeat a summary judgment motion."

*Mungro v. Giant Food, Inc.*, 187 F. Supp. 2d 518, 523 (D. Md. 2002) (Motz, J.).

**B.      Plaintiff's § 1981 Claim Must Fail**

In her § 1981 claim, Plaintiff variously asserts that she was harassed and terminated

because of her race and in retaliation for complaining of race discrimination.  The law and the

undisputed material facts, however, do not support her assertions.

**1.      The Legal Standards Applicable to § 1981**

The same standards of analysis apply to § 1981 claims and Title VII claims.  *See Causey*

*v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998); *Morrow v. Farrell*, 187 F. Supp. 2d. 548, 553 (D.

Md.), *aff'd* 2002 U.S. App. LEXIS 23716 (4th Cir. 2002); *Connor v. Giant Food, Inc.*, 187 F.

Supp. 2d 494 (D. Md. 2002) (Motz, J.).  In order to recover under § 1981 and Title VII, a

plaintiff must establish that race was a factor in the decision at issue.  The plaintiff may make

this showing in one of two ways: by producing direct evidence that race was a factor, or by

proffering indirect evidence that could reasonably create an inference of discrimination.  Direct

evidence consists of express statements by decision-makers that the plaintiff's race was the basis

for the challenged employment decision.  Stray remarks unconnected to any employment

decision, even if made by decision-makers, do not constitute direct evidence.  *See, e.g, Brinkley*

*v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999).

In the present case, Plaintiff relies upon a number of statements allegedly made by her

supervisor, Mr. Shetterly, as evidence of his discriminatory animus; specifically: (1) an alleged

comment that her husband "could still go;" (2) an alleged question as to whether she knew any

drug dealers; (3) a purported comment about the cost of her house; and (4) a number of alleged comments about her car.  None of these alleged statements refer to Plaintiff's race, either directly or indirectly.[11]

These claimed comments clearly do not refer to Plaintiff's race in any manner, and Plaintiff admits that Mr. Shetterly never made any comments about her race.  Plaintiff's characterization of these statements as racially biased is rank speculation based on surmise and conjecture.  As the Fourth Circuit Court of Appeals has noted, "subjective beliefs" are insufficient to support a plaintiff's claims of discriminatory conduct by the employer.  *See, e.g., Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 135 (4th Cir. 2002); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) (unsupported speculation is insufficient evidence of discrimination).  Moreover, even if Mr. Shetterly's alleged remarks may be deemed offensive, "Title VII was not designed to create a federal remedy for all offensive language . . . in the workplace." *Hopkins v. Baltimore Gas & Elec.,* 77 F.3d 745, 754 (4th Cir. 1996).

Because Plaintiff has failed to establish direct evidence of discrimination, the well-known McDonnell Douglas burden-shifting analysis applies to these claims.  *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 196 (4th Cir. 1997); *Mungro,* 187 F. Supp. 2d at 521.   Under that standard:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection" . . .  Third, should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

---

[11]   As previously noted, in her Amended EEOC Charge of Discrimination, Plaintiff cited the comments about her car and the drug dealers as evidence of disability discrimination, and not race discrimination.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 450 U.S. 252-53 (1983), *quoting,*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Further, although the establishment of a *prima facie* case shifts the burden of production

to the defendant to articulate a non-discriminatory reason for its actions, the burden of proving

discrimination remains at all times with the plaintiff.  *Burdine*, 450 U.S. at 253.   And, once the

defendant articulates a legitimate, non-discriminatory reason for its decision, the presumption of

discrimination established by the prima facie case "drops from the case."  *Id.*, 450 U.S. at 254-

55, n. 10.   At this point, the "inquiry ... turns from the few generalized factors that establish a

prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have

introduced." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993).

### 2.        Plaintiff's Harassment Claim Is Without Basis

Plaintiff alleges that she was subjected to harassment on the basis of her race and in

retaliation for her "complaint."  Specifically, she alleges that her supervisor, Mr. Shetterly,

unfairly disciplined her for patient complaints and made the comments discussed above.  Her

claim fails, however, because she cannot establish a *prima facie* case of discrimination or

retaliation.

### a.        Plaintiff cannot establish a *prima facie* case of discrimination.

In order to establish a *prima facie* case that discipline was discriminatory, a plaintiff must

show:

(1)     That she is a member of a protected class;
(2)     That her misconduct was of comparable seriousness to the misconduct of
        employees not within the protected class;

(3)    The discipline imposed upon the plaintiff was more severe than that imposed upon the similarly situated employees.

*Cook v. CSX Transportation Co.*, 988 F.3d 507, 511 (4th Cir. 2002).  In the present case, there is no dispute that Plaintiff is a member of a protected class.  However, she wholly fails to establish the second and third elements of the *prima facie* case.

Plaintiff offers no evidence that other, non-minority employees engaged in similar misconduct or that they received dissimilar discipline.  She does not identify any Caucasian employees who were the subject of patient complaints.  Her failure to do so undermines her claim of discriminatory treatment.  *See Adams v. Giant Food, Inc.*, 225 F. Supp. 2d 600, 603 (D. Md. 2002 (Motz, J.) (plaintiffs unable to establish *prima facie* case where they "offered no evidence" that non-African-American employees were treated differently); *Mathews v. Giant Food, Inc.*, 187 F. Supp. 2d 486, 489-90 (D. Md. 2002) (Motz, J.) (no *prima facie* case where plaintiff failed to show white employees treated differently for same violations).

**b.    Plaintiff cannot establish a *prima facie* case of retaliation.**

To make a *prima facie* case of retaliation, the plaintiff must show:

(1)    That she engaged in a protected activity;
(2)    That an adverse employment action was taken against her; and
(3)    That there was a causal link between the protected activity and the adverse employment action..

*Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir.), *cert. denied* 519 U.S. 818 (1996).  Plaintiff cannot establish the first element of such a claim, and therefore her claim that the discipline for the patient complaints was retaliatory must fail.

With regard to that first element, an employer may not take adverse employment action against an employee for opposing discriminatory practices in the workplace. *See* 42 U.S.C. § 2000e-3(a); *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998). The Fourth Circuit has stated that, "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to attention to <u>an employer's discriminatory activities</u>." *Laughlin*, 1489 F.3d at 259 (emphasis added).

Plaintiff admits that she never complained to anyone at Harbor Hospital that any of her managers was engaging in discriminatory activity in violation of anti-discrimination laws. Her written responses to the discipline that she received does not refer to possible race discrimination, whether by patients or her supervisor. Plaintiff's sole "complaint" of discrimination was her alleged verbal statement to her managers that she believed there were "racial tones" in the first patient complaint against her. Plaintiff never complained that <u>her employer</u> engaged in discriminatory activities against her – i.e. that the discipline imposed upon her by her managers for the patient complaints was racially motivated. Thus, there can no reasonable, good-faith belief that the complained-of patient conduct constituted an employer violation of Title VII or § 1981. *See Adams*, 225 F. Supp. at 606.

Moreover, Plaintiff's so-called "complaint" is simply too vague to constitute protected opposition. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313-14 (6th Cir. 1989) ("A vague charge of discrimination in an internal letter or memorandum is insufficient to

constitute opposition to an unlawful employment practice.").  Consequently, Plaintiff cannot demonstrate that she engaged in protected opposition to discriminatory activities by her employer, and fails to establish the first element of a retaliation claim.  Her claim that she was subjected to retaliatory discipline for patient complaints, therefore, must be dismissed.

### 3.    Plaintiff's Termination Claim Is Without Basis

Although Plaintiff admits that she made two labeling errors, which are serious safety violations, she alleges that she was terminated both because of her race and in retaliation for her "complaint."  This claim is also deficient because she cannot meet the elements of a *prima facie* case of discriminatory or retaliatory discharge.

### a.    Plaintiff cannot establish a *prima facie* case of discriminatory discharge.

In order to establish a *prima facie* case of discriminatory discharge, Plaintiff must demonstrate the following elements:

(1)    She is a member of a protected class;
(2)    She was qualified for her job and her job performance was satisfactory;
(3)    She was fired; and
(4)    Other employees who are not members of the protected class were retained under apparently similar circumstances.

*Mungro*, 187 F. Supp. 2d at 522.

There is no dispute that Plaintiff meets the first and third elements of her *prima facie* case – she is a member of a protected class and that she was terminated from employment.  Plaintiff cannot demonstrate, however, the second element – that her job performance was satisfactory.  As this Court has stated, "A plaintiff who violates company policy and fails to improve his performance despite a warning has not demonstrated satisfactory performance."  *Mungro*, 187 F.

Supp. 2d at 522.  Plaintiff committed a serious violation of Hospital policy in mislabeling a patient chart.  As a result, she received a final written warning and a suspension.  Plaintiff admits that her supervisor specifically discussed with her the need to check her labeling and to avoid further errors of a like nature.  Nonetheless, less then three weeks later, Plaintiff admittedly committed the very same violation.  Therefore, her job performance cannot be deemed satisfactory.  *See, e.g., Mungro*, 187 F. Supp. 2d at 520-22 (no satisfactory job performance where driver committed two violations of communications policy); *Blair v. Colonnas Shipyard, Inc.*, 52 F. Supp. 2d 687, 694 (E.D. Va. 1999), *aff'd,* 203 F.3d 810 (4th Cir. 2000) (employee who violated policies that were considered "very important" by employer did not have satisfactory job performance and could not establish *prima facie* case).

Plaintiff agrees that she should be disciplined for the two violations, but disputes that they warranted termination.  However, as discussed above, her belief as to the level of appropriate discipline is not relevant.  As this Court stated:

> What matters is not the employee's self-perception regarding the quality of his job performance, but the perception of the decision-maker. . . .  This is true regardless of the wisdom of the policy in question, or the wisdom of strict adherence to it, neither of which are within the court's purview to question.  The court does not sit as a super-personnel department and thus cannot decide whether the reason [for the termination] was wise, fair, or even correct, so long as it truly was the reason for the plaintiff's termination.

*Mungro*, 187 F. Supp. 2d at 522. (internal citations omitted, quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (Title VII "not a vehicle for substituting the judgment of a court for that of the employer." (internal quotation omitted)).  In this case, the Hospital views mislabeling as a serious safety violation, which Plaintiff does not and cannot dispute.  The

Hospital determined that Plaintiff's two such violations, within a three-week period, warranted termination, and its business judgment is not subject to review.

Plaintiff also fails to meet the fourth element of her *prima facie* case – that other non-minority employees were not terminated for similar violations. It is undisputed that Plaintiff is the only Hospital employee to have committed two labeling errors. Thus, she cannot demonstrate that there are any employees similarly situated to her. *Mungro*, 187 F. Supp. 2d at 523 (no *prima facie* case where no other employees were similarly situated to plaintiff); *Mathews*, 187 F. Supp. 2d at 489-90 (plaintiff failed to show white employees not terminated for same violations).

Plaintiff attempts to compare herself to two other employees, Ms. Gittins and Ms. Cook, who each committed a single labeling error but received lesser disciplinary actions than Plaintiff, in that they were not terminated. This comparison is improper, since their offense was not of "comparable seriousness" to that of Plaintiff. *See Morrow v. Farrell,* 187 F. Supp. 2d 548, 554-55 (D. Md. 2002); *Cook*, 988 F.3d at 511. It also is important to emphasize that one of the employees was Caucasian and one African-American. The fact that these two employees were treated the same for committing the same error further undercuts Plaintiff's discrimination claim.

Because of Plaintiff's inability to establish all of the elements of a *prima facie* case, her claim of discriminatory discharge under § 1981 must fail.

      **b.**    **Plaintiff cannot establish a *prima facie* case of retaliatory discharge.**

The elements of a *prima facie* case of retaliatory discharge are the same as the elements for retaliation, set forth above. Plaintiff meets the second element, in that she was terminated.

As discussed above, however, she cannot demonstrate the first element – that she engaged in protected opposition to discriminatory activity by her employer.

In addition, she cannot establish the third element by showing a causal connection between her alleged "complaint" about a patient's "racial tones" six months previously and her termination, which was based on her clear and repeated serious violations of Hospital policy. The temporal proximity between her complaint and her termination (6 months) alone is not sufficient to establish a *prima facie* claim, absent any other showing of causal connection. *See Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four month lag between protected activity and termination not sufficient to justify an inference of causation) (*cited in Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998)); *VanDevander v. St. Mary's County Sheriff's Ofc.*, 2001 U.S. Dist. LEXIS 7080 * 29 (D. Md. 2001) (five-month lag too long to support retaliation claim, absent other showing of causal connection) (attached as Exhibit 26). Because of Plaintiff's failure to establish a *prima facie* case, her claim for retaliatory discharge under § 1981 must be dismissed.

### 4.    Plaintiff Cannot Demonstrate Pretext

Because Plaintiff has not met the elements of any *prima facie* case, the Hospital is not required to proffer a legitimate non-discriminatory reason for its discipline and discharge of Plaintiff. *King v. Rumsfeld*, 328 F.3d 145, 150 (4th Cir. 2003) ("since [plaintiff] never established a prima facie case as to his discrimination claims, [employer] is under no duty to supply an explanation for [plaintiff's] discharge.") Assuming that she had made a *prima facie* case, however, the Hospital has legitimate non-discriminatory reasons for its adverse employment actions.

As to the discipline for the patient complaints, there is no dispute that four patients complained about Plaintiff's treatment of them. Plaintiff also concedes that, if the complaints were legitimate ones, she should have been disciplined for them. Whether her conduct warranted discipline or not is not Plaintiff's decision to make; it is the Hospital's. *Mungro*, 187 F. Supp. 2d at 522; *DeJarnette v. Corning Inc.*, 133 F.3d at 299. The Hospital received the patient complaints over a six-week period from different patients, for conduct similar to that which Plaintiff exhibited in the past. The Hospital investigated the complaints by interviewing the patients and Plaintiff. She had also received training, on multiple occasions, as to the appropriate behavior with patients. The Hospital's decision to credit the patient complaints and impose progressive discipline, in accordance with its policies, was both legitimate and appropriate, given the circumstances.

With respect to Plaintiff's termination, it is undisputed that she had committed a first mislabeling error for which she was disciplined and counseled. It is also undisputed that, three weeks later, she committed the same error, demonstrating a continued carelessness and unwillingness to improve. These errors threatened patient safety, and the Hospital legitimately determined that termination was the appropriate discipline. As with the Hospital's other disciplinary decisions concerning Plaintiff, its business judgment cannot be questioned. *Mungro*, 187 F. Supp. 2d at 522; *DeJarnette v. Corning Inc.*, 133 F.3d at 299.

There is no probative evidence that could support the claim that that these reasons are mere pretexts for unlawful discrimination or retaliation. Indeed, there is no evidence of pretext at all. Plaintiff does not dispute that patients complained about her or that she made the two

labeling errors upon which her termination was based. *See Connor v. Giant Food, Inc.*, 187 F. Supp. 2d 494, 498 (D. Md. 2002) (Motz, J.) (no pretext where, although plaintiff disagreed with disciplinary decision, he presented no evidence that employer did not actually believe misconduct had taken place).

Plaintiff cites certain statements by Mr. Shetterly as evidence of his racial bias. As discussed above, however, these statements do not refer to Plaintiff's race in any manner, and do not support a finding of pretext.

In her Complaint, Plaintiff alleges that "white employees were treated different [sic] than Plaintiff." Amended Complaint, para. 8. As the basis for this allegation, Plaintiff cites a white employee who refused to work in the X-ray department, which she considered insubordinate. Claude Depo. at 199. Plaintiff acknowledges, however, that she herself was not present for this incident. She does not and cannot show that any African-American employee also refused to work in the X-ray department, but was disciplined. Plaintiff wholly fails to demonstrate how this employee was treated differently from African-American employees, and more specifically, herself.

Plaintiff also alleges, in her Complaint, that the Hospital engaged in a pattern and practice of discrimination, in that black employees were terminated at a disproportionate rate. Amended Complaint, para. 9. Her evidence of that so-called "pattern and practice" are a hearsay conversation with a white employee, who ostensibly said that she was terminated because she dated a "black guy," and a hearsay conversation with a black employee who told her that he quit.

Claude Depo. at 201-03.  Neither situation, however, establishes that <u>African-American</u> employees were <u>terminated</u> at a higher rate than white employees.  Indeed, Plaintiff admits that she is not sure if African-American employees were terminated at a higher rate than white employees.  Claude Depo. at 201.  This cannot be considered evidence of pretext.

Thus, her failure to establish pretext also dooms her § 1981 claim.  *King*, 328 F.3d at 154 (court granted motion for summary judgment where plaintiff failed to show pretext); *Connor*, 187 F. Supp. 2d at 498.

**C.    Plaintiff's Intentional Infliction of Emotional Distress Claim Must Fail**

Plaintiff also claims that the above-described actions of the Hospital constitute intentional infliction of emotional distress.  In order to state a cause of action for intentional infliction of emotional distress, the Plaintiff must show:

(1)    The conduct was intentional or reckless;
(2)    The conduct was extreme and outrageous;
(3)    There is a causal connection between the wrongful conduct and the emotional distress; and
(4)    The emotional distress is severe.

*Harris v. Jones*, 281 Md. 560 (Md. 1977).  Claims for intentional infliction of emotional distress are rarely upheld.  In *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46 (Ct. Spec. App. 1986) the Maryland Court of Special Appeals noted, "its balm [is] reserved for those wounds that are truly severe and incapable of healing themselves."  *Id.* at 55 ; *Beye v. Bureau of National Affairs*, 59 Md. App. 642, 658, *cert. denied*, 301 Md. 639, (Ct. Spec. App. 1984); *Continental Casualty Co. v. Mirabile*, 52 Md. App. 387, *cert. denied*, 294 Md. 652 (Ct. Spec. App. 1982).

Plaintiff cannot demonstrate that the Hospital's conduct was sufficiently extreme or outrageous to support her claim.  In order to meet this standard, she must show that the Hospital's conduct is "so extreme in degree as to go beyond all possible bounds of decency" and would "be regarded as atrocious and utterly intolerable in a civilized community."  *Batson v. Shiflett*, 325 Md. 684, 733-734 (1992).

Plaintiff alleges that her supervisor made certain comments to her and disciplined her, that the Hospital failed to respond to her complaints about her supervisor, and that she was told before entering surgery, that she could have been terminated.  The Maryland courts have found racially-based conduct more egregious than that alleged by Plaintiff insufficiently extreme or outrageous to support a claim for intentional infliction of emotional distress.  For example, in *Collier v. Ram Partners, Inc.*, 159 F. Supp. 2d 889 (D. Md. 2001) the plaintiff was subjected to racial epithets and racist remarks, was physically threatened, and the company did not respond to her complaints.  The Court found that the conduct, "although certainly abhorrent," did not rise to the high level of outrageousness required.  *Id*. at 902.  Likewise, in *Etefia v. East Baltimore Comm'y Corp.*, 2 F. Supp. 2d 751 (D. Md. 1998), comments about the plaintiff's nation origin, a failure to promote, discriminatory work assignments, and his termination did not rise to the required level of extreme or outrageous behavior.  *Id*. at 764.

Plaintiff's claim for intentional infliction of emotional distress is without merit, and should be dismissed.

## IV.    CONCLUSION

For all of the reasons expressed above, the Hospital respectfully requests that this Court grant its Motion for Summary Judgment on all Plaintiff's claims for relief, and grant such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/

_____
Bruce S. Harrison

/s/

_____
Fiona W. Ong
SHAWE & ROSENTHAL, LLP
20 S. Charles St., 11th Floor
Baltimore, MD 21201
Telephone:  (410) 752-1040
Facsimile:  (410) 752-8861

Attorneys for Defendant

August 7, 2003

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing Motion for Summary Judgment and Memorandum in Support, and Exhibits were electronically filed this 7th day of August, 2003.  In the event counsel for Plaintiff is not registered with the Court for service electronically, a paper copy will be mailed on August 7, 2003, via first-class mail, postage prepaid, to:

> Norris Ramsey, Esquire
> Norris Ramsey, P.A.
> 2122 Maryland Avenue
> Baltimore, MD  21218

/s/

_____

Fiona W. Ong