COPY

1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MARYLAND
 3   PATRICIA CLAUDE            *
 4            Plaintiff         *
 5   vs.                        *  Case No. JFM-022511
 6   HARBOR HOSPITAL CENTER     *
 7            Defendant         *
 8   *******************************************
 9        Deposition of CAROL L. LUPINOS was taken
10   on Monday, May 5, 2003, commencing at 12:37 p.m.,
11   at the Law Offices of Shawe & Rosenthal, 20 South
12   Charles Street, 11th Floor, Baltimore, Maryland,
13   before Abraham Weinapple, Notary Public.
14   *******************************************
15
16
17
18
19
20   REPORTED BY:
21   A. WEINAPPLE
```

CRC-Salomon
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

4

1  A. From the beginning or --

2  Q. Yes, ma'am, from the beginning?

3  A. Initially, just as a co-worker. I was
4  the supervisor of another area within the same
5  department, and then ultimately I was the
6  supervisor of within that department but not her
7  supervisor, and then I was the manager of the
8  department, so she came under me as a manager and
9  she was the employee.

10 Q. So you were her direct manager?

11 A. Yes.

12 Q. And when was that?

13 A. But not her direct manager. Her
14 manager, yes, but not supervisor. There was a
15 layer in between us.

16 Q. Can you explain that hierarchy beginning
17 with, I guess, the first line supervisor?

18 A. Within the department is the manager,
19 which would be myself. Below me is a supervisor,
20 that would be Mr. Shetterly or Ms. White, and
21 then the staff below that.

5

1  Q. Did there come a time when Ms. Claude
2  was terminated?
3  A. Yes.
4  Q. What, if any, knowledge did you have
5  concerning the reason for her termination?
6  A. I was involved with it.
7  Q. In what way?
8  A. When the incident occurred that
9  precipitated her termination, Mr. Shetterly
10 approached me and made me aware of the incident,
11 and I instructed him to confer with HR about the
12 incident, and I was involved in -- I was involved
13 in their discussions and ultimately involved in
14 the termination.
15 Q. To your knowledge, did Mrs. Claude ever
16 complain about racial discrimination to anyone at
17 the hospital?
18 A. Not to me, no.
19 Q. To your knowledge, did she complain to
20 anyone else other than you?
21 A. No, not to my knowledge.

8

1  nature?
2     A.  After she was terminated.
3     Q.  After she was terminated.  What are your
4  job duties?
5     A.  My job duties?
6     Q.  Yes, ma'am.
7     A.  Essentially, I manage the day-to-day
8  operations of the department.  I'm responsible
9  for the budget, responsible for various reports
10 that I check and maintain on a daily basis, I
11 attend meetings, things like that.
12    Q.  Do you know whether or not Ms. Claude
13 was given any training for the position that she
14 was terminated from?
15    A.  Yes, she was.
16    Q.  Can you tell us what kind of training
17 she received?
18    A.  Everyone in the department, when we went
19 live with the current computer system, went
20 through training to -- they went through training
21 on the system and the various functions of the

```
 1        A.   Yes.  That was since -- that was after
 2   she left.
 3        Q.   Since she was terminated?
 4        A.   But up to that time there had been no
 5   identified labeling errors.  Pat was the first.
 6        Q.   If the employee had caught the error
 7   before it went to whatever department the file
 8   was supposed to be sent to, would they have been
 9   able to correct that error without being
10   disciplined?
11        A.   If it had not -- yes, if they realized
12   they had made their mistake.
13        Q.   Were there any checks and balances
14   concerning the performance of the duties within
15   that department to make sure that they were
16   correctly performing the labeling, so that
17   somebody's leg didn't get cut off when they were
18   supposed to have an operation on their hand, for
19   example?
20        A.   Every time a patient is registered and
21   you create the paperwork, it's incumbent upon the
```

registrar to make sure that all the paperwork is correct before it leaves their hands.

Q. So there's nobody who periodically review files to make sure that these types of duties are being performed correctly?

A. No.

Q. Were the labeling errors what caused her to be ultimately terminated?

A. Yes.

Q. Was no prior disciplinary action that had been taken against her considered when she was terminated?

A. Her entire employment history was -- her entire disciplinary history was taken into consideration.

Q. Would that have been since the date of her employment?

A. From myself, it would have been the disciplinary action that I was involved with and under my area of responsibility.

Q. And how far did that go back?

1  Q. Were they taken into consideration when
2  Ms. Claude was terminated, those disciplinary
3  actions?
4  A. Yes.
5  Q. Did you give anymore weight to one area
6  than others, that is, the patient relationship
7  versus mislabeling?
8  A. No, no.
9  Q. The mislabeling was less serious, more
10 serious, or the same as patient --
11 A. The labeling error was very serious. It
12 could have caused patient injury, death, wrong
13 blood type given. The first one, in fact,
14 actually was caught by the Blood Bank when a
15 blood sample had been sent to them with an
16 incorrect label on it.
17 Q. So incorrect labeling could have caused
18 the hospital to be subject to malpractice, or
19 sued, or cause patient's injury --
20 A. It could cause --
21 Q. -- or death, or that kind of thing?

A. Yes.

Q. Is that a fair statement?

A. Yes, it is.

Q. And is that why you treat labeling as more serious, perhaps, than other infractions?

A. Yes.

Q. How many labeling errors could a registrar make before you fire her or him?

A. The first time a labeling error occurs the employee receives a First Written Warning. I believe it's First Written.

Q. And I see with regard to Shemeira Cook she received a First Written Warning?

A. Correct.

Q. And Ms. Gittins the same thing, First Written Warning?

A. That's correct.

Q. So if I'm correct, with regard to labeling errors you would have followed your disciplinary procedures, that is, verbal warning, First Written Warning, Final Written Warning,

1  suspension and then termination?

2      A. Labeling error is a significant error,
3  and warrants a more severe penalty than just a
4  verbal warning. That's why we start with the
5  First Written.

6      Q. Would it be your testimony today that
7  Ms. Claude never complained about the supervision
8  of Mr. Shetterly?

9      A. She didn't complain.

10     Q. She didn't complain to you?

11     A. No.

12     Q. To your knowledge, did she ever complain
13 to anyone else?

14     A. No.

15     Q. To your knowledge, did she file a
16 grievance? I have a Grievance File, but I guess
17 that grievance would concern her termination;
18 would that be a fair statement?

19     A. That's correct.

20     Q. At the time of her termination, Ms.
21 Patricia Claude had been about a 15-year

1  employee; would that be a fair statement?
2      A.  Yes, something like that.
3      Q.  Was there anything else you all could
4  have done other than terminate her, that is,
5  place her in another position?
6      A.  There were no other positions within our
7  department.
8      Q.  Could she have been transferred back
9  down to the department she had transferred out
10 of?
11     A.  That was not a previous department.
12 That was the same department, just a different
13 area.
14     Q.  Other than Ms. Patricia Claude, has any
15 or have any other employees been terminated for
16 labeling errors?
17     A.  We've had no other incidents that I'm
18 aware of other than the two that have been
19 brought before us, you know, the past two errors
20 and then the other one involving Ms. Cook and
21 Ms. Gittins.

26

1  unrelated.
2      Q.   She claims that somebody made a
3  statement to her when she went to Human
4  Resources, I believe, to file a grievance, and
5  this was prior to her surgery, that an individual
6  made a statement that we were going to terminate
7  you prior to your surgery, but we didn't want you
8  to go into surgery with that on your mind?
9      A.   We had a -- Pat was at a point in her
10 disciplinary action where she could have been
11 terminated at that point.
12     Q.   Right.  At that point meaning what date?
13     A.   November of 2001, just prior to her
14 surgery.
15     Q.   And was there a decision by the hospital
16 to delay that because she was going out on
17 surgery and the hospital wanted to make sure she
18 had her fringe benefits?
19     A.   The ultimate decision to not terminate
20 Pat was made, yes, by me.
21     Q.   Okay.

29

1   you considered in making your decision to
2   terminate Ms. Claude.  It's my understanding that
3   she was terminated through your disciplinary
4   procedure based upon the errors that she made in
5   labeling; is that a fair statement?
6       A.   Yes.
7       Q.   And I understand further that you were
8   aware that there were some patient complaints, et
9   cetera, concerning Ms. Claude?
10      A.   Yes, I was.
11      Q.   And that that did not figure in your
12  decision to terminate Ms. Claude; is that a fair
13  statement?
14      A.   The immediate decision to terminate her
15  was based on the corrective action involving the
16  labeling.
17      Q.   Subsequently, --
18      A.   Subsequently.
19      Q.   -- did you reconsider your decision and
20  included other disciplinary action that had been
21  taken against her, such as the patient

1   supervisor.

2   Q. Well, did you review her Personnel File

3   when to made the decision to terminate her?

4   A. Yes.

5   Q. Did you review everything in the

6   Personnel File?

7   A. I reviewed everything in the file that I

8   had, the working file that I had.

9   Q. And the working file would have been

10  your Departmental file?

11  A. Uh-huh.

12  Q. I'm going to show you what I believe

13  would be the Departmental File on Ms. Claude.

14  A. Okay.

15  Q. You considered everything in that

16  Departmental File in making your decision to

17  terminate her?

18  A. Uh-huh.

19  Q. I'm currently looking at the Grievance

20  file, and I see a handwritten document. I want

21  to know whether or not you recognize any of this?

34

1    Q.  I want to show you Ms. Claude's labeling
2    error sheet.  Now, she received a
3    two-day suspension for her first labeling error.
4    Can you tell me why she didn't receive a First
5    Written Warning?
6         A.  Because this blood sample had gone to
7    the Blood Bank already to be crossed matched to a
8    unit of blood for a patient, and it's the wrong
9    patient.
10        Q.  So was it a more serious labeling error?
11        A.  Yes.
12        Q.  How would you characterize it?
13        A.  Had the patient -- had the blood type
14   been -- had the unit of blood been cross matched
15   based on the patient who was already in the
16   medical records, in the lab medical records
17   system, this patient could have gotten the wrong
18   blood type and could have been seriously harmed.
19        Q.  So going to a First Written Warning is
20   not mandatory, or is it?
21        A.  No, it's not.

1    Q.  In making that --

2    A.  It's not.

3    Q.  In making that decision of what

4 discipline you impose, what do you take into

5 account for that?

6    A.  The severity of the incident.

7        MR. ONG: I have no further questions.

8        MR. RAMSEY: I have no further

9 questions.

10       (EXAMINATION CONCLUDED)

11       -----------------------

12       MS. ONG: Just to let you know, after

13 this deposition has ended it will be prepared and

14 you will have the opportunity to review the

15 transcript and make any corrections or

16 typographical errors, misspellings of names,

17 things like that.  You will not be able to change

18 your testimony in any substantive way, but at

19 least you can correct minor errors, and then

20 you'll have a chance to sign the deposition

21 transcript.