1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND

2

3     PATRICIA CLAUDE,                    *

4              Plaintiff,                 * CIVIL ACTION NO:

5                                         * JFM-02-2511

6          vs.                           *

7                                         *

8     HELIX HEALTH SYSTEM, INC.,          *

9     t/a HARBOR HOSPITAL,                * (Pages: 1-60)

10             Defendant.                 *

11    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

12

13          The deposition of **LUCY WHITE** was taken

14    on Monday, May 5, 2003, commencing at 9:21 a.m., at

15    the Law Offices of Shawe & Rosenthal, L.L.P., 20

16    South Charles Street, Baltimore, Maryland, 21201,

17    before Jennifer Burghardt, Notary Public.

18

19    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

20    Reported by:

21          Jennifer Burghardt

*Al Betz & Associates, Inc.*
Maryland 410-875-3376
Washington, D.C. 202-265-0015



3

| | | |
|---|---|---|
| 1 | | P R O C E E D I N G S |
| 2 | | |
| 3 | | Whereupon -- |
| 4 | | LUCY WHITE, |
| 5 | | a witness, called for examination, having been |
| 6 | | first duly sworn, was examined and testified as |
| 7 | | follows: |
| 8 | | EXAMINATION BY MR. RAMSEY: |
| 9 | Q. | We have here Miss Lucy White? |
| 10 | A. | Right. |
| 11 | Q. | Is that correct? |
| 12 | A. | Yes, it is. |
| 13 | Q. | Miss White, my name is Norris Ramsey, and |
| 14 | | I represent Patricia Claude in a case against |
| 15 | | Harbor Hospital. As I understand it, at one time |
| 16 | | you were Miss Claude's supervisor; is that correct? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And how long were you her supervisor? |
| 19 | A. | I believe it was from 1988 to 2000. |
| 20 | Q. | 1988 to 2000? |
| 21 | A. | Uh-huh. |

*Al Betz & Associates, Inc.*
Maryland 410-875-3376
Washington, D.C. 202-265-0015

5

1      it was Emergency Room Registration and Outpatient

2      combined.

3          Q.    Okay.  Was she doing two jobs?

4          A.    No.  Everybody -- I mean, the way the

5      place was set up, when a person walked in, they

6      were registered in one place whether they were

7      there for the emergency room or whether they were

8      there for private outpatient.  And then when they

9      remodeled the ER is when somebody was put down in

10     X-ray Registration individually.

11         Q.    Okay.  You said in 1999 you had a problem

12     with Miss Claude; is that correct?

13         A.    The X-ray Department Manager said that he

14     had had some complaints.

15         Q.    And who was that individual?

16         A.    Joe --

17               (Interruption by Reporter.)

18         A.    Joe Zilox.

19         Q.    And you spell that as?

20         A.    Z-I-L-O-X.

21         Q.    Okay.  And was she written up about any

*Al Betz & Associates, Inc.*
Maryland 410-875-3376
Washington, D.C. 202-265-0015

6

1     of the complaints by Joe Zilox?

2          A.    Not that I'm aware of.

3          Q.    You didn't write her up; did you?

4          A.    No.

5          Q.    What kind of employee would you describe

6     her in terms of her relationship to -- correction

7     -- in terms of how she treated persons who came in

8     to be registered?

9          A.    When she was in my area, I was in

10    this -- I was right in the area also.  So, you

11    know, I could always see what all the employees

12    were doing, and, you know, I never had a problem

13    then.  It was when she was put down in X-ray and

14    there wasn't really supervision down there.

15         Q.    Okay.  Now, but you were her supervisor?

16         A.    Yes, uh-huh.

17         Q.    Did Joe Zilox ever put anything in

18    writing to you concerning Miss Claude?

19         A.    Not to me.

20         Q.    And what kind of problems did he say that

21    he was having with her?

*Al Betz & Associates, Inc.*
Maryland 410-875-3376
Washington, D.C. 202-265-0015

1    A.    That she was being rude to patients.

2    Q.    But you had never observed that?

3    A.    No, not personally.

4    Q.    When persons in positions such as

5    Miss Claude's, if a patient complained about the

6    person being rude or whatever, what, if any,

7    disciplinary action would be taken against that

8    individual?

9    A.    I'd verbally talk to her when we received

10    those complaints.

11    Q.    You verbally talked to her about that?

12    A.    Yes.

13    Q.    But you did not write her up?

14    A.    No.

15    Q.    Now, I believe her performance

16    evaluations are contained in either her personnel

17    file or her department file, and I'd like to see if

18    we could go through those evaluations.  I think

19    that they may be contained here in this file.

20    A.    Oh, okay.

21    Q.    Okay.

1    folders?

2        A.    Well, when we -- when she first started,

3    we used a little plate that we stamped everything

4    with, and then we went to labels several years

5    later and, yes, everything had to be labeled.

6        Q.    Okay.   While she was under your

7    supervision, did she have a problem labeling?

8    Was there errors?

9        A.    No.

10        Q.    Did there come a time when you learned

11    that Miss Claude was being disciplined for failure

12    to label properly?

13        A.    I heard about it, yes.

14        Q.    You heard about it.   What did you hear

15    about it?

16        A.    Just that she mislabeled a patient.

17        Q.    Okay.   Have you ever had the occasion

18    where someone under your supervision has mislabeled

19    patients?

20        A.    No, sir.

21        Q.    Never in your -- how many years have you

12

1    been working at Harbor?

2          A.    It was 27 years in April.

3          Q.    Twenty-seven years in April.  And you

4    never had that to occur?

5          A.    No, sir.

6          Q.    With an employee under your supervision?

7          A.    No, sir.

8          Q.    When Miss Claude transferred from under

9    your supervision, she went under Tim Shuttelly?

10         A.    Shuttelly.

11         Q.    Shuttelly; is that correct?

12         A.    Yes, sir.

13         Q.    Do you know Mr. Tim Shuttelly?

14         A.    We share an office.

15         Q.    Okay.  Did you ever hear him discuss Miss

16   Claude concerning her performance?

17         A.    No.

18         Q.    Were you ever in the presence of

19   Miss Claude and Mr. Shuttelly during the time that

20   they had conversation between each other?

21         A.    I was generally in the office, you know,

14

1    the desk to label all their papers.

2        Q.   Okay.  So they would put information, I

3    guess, into a computer or something?

4        A.   Correct.

5        Q.   And the labels would print --

6        A.   And it prints out in a little room.

7        Q.   And then the individual would have to go

8    into that little room and get the label and go back

9    to their desk and then label the folder?

10       A.   Correct.

11       Q.   Is that a fair statement?

12       A.   Uh-huh.

13       Q.   Have you ever been in that room where the

14    labels print out?

15       A.   Yes, sir.

16       Q.   Can you describe the room for us, please?

17       A.   Well, it's a small room.  It's got two

18    label makers and a printer.

19       Q.   Okay.

20       A.   A laser printer.

21       Q.   Now, when you say label makers, I have

16

```
 1                MS. ONG:  Objection.

 2     Mischaracterize --

 3          A.    -- from the computer.

 4          Q.    Go ahead.

 5          A.    From the computer.

 6          Q.    All right.  So --

 7          A.    Once you finish doing the patient, the

 8     labels automatically print.

 9          Q.    Right.  And she goes in this room, and

10     she gets the labels, she comes back, and she puts

11     them on the folders; is that correct?

12          A.    Correct.

13          Q.    Would you describe the lighting in that

14     room, if you can?

15          A.    It's fine.  I mean, we have a big window,

16     you know, with the blinds.

17          Q.    Right.  So if you open the blinds, you

18     would have plenty of light?

19          A.    Yes.

20          Q.    And there's a light in there?

21          A.    Yes.
```

**Al Betz & Associates, Inc.**
Maryland 410-875-3376
Washington, D.C. 202-265-0015

17

1    Q.   Okay.  Can you -- are you able to tell us

2    what else is in that room besides the printer?

3    A.   What else is in that room?

4    Q.   Yes, ma'am.

5    A.   Let's see.  There's a cabinet, you know,

6    where we keep all our forms, and then on this side

7    is a desk and a fax machine, table with a fax

8    machine.

9    Q.   Okay.  Where is the paper stored?

10   A.   The paper?

11   Q.   Yes.

12   A.   Usually out by the Xerox machine.

13   Q.   Okay.  What about the labels, that is the

14   blank labels that go through the --

15   A.   In that big file cabinet.

16   Q.   In a big file cabinet?

17   A.   The one I just said was in that little

18   room.

19   Q.   Okay.  Have you ever had the occasion to

20   terminate an employee?

21   A.   Yes.

23

1       A.   She did ask for assistance, but we were

2    short-staffed, and we were budgeted, and people

3    were cut.  So I didn't have anybody to send down to

4    help her.

5       Q.   I see.  And during the period of time

6    when you weren't able to send anybody down to help

7    her, was that when Mr. Zilox began to complain

8    about Miss Claude?

9       A.   I don't remember.

10      Q.   But it is your recollection that even

11   though Mr. Zilox may have complained, no action was

12   taken against Miss Claude as a result of his

13   complaints?

14      A.   Yes.  She was transferred back up to the

15   admitting office temporarily.

16      Q.   Okay.  When you say she was transferred

17   temporarily, I don't -- can you further explain why

18   you say temporarily?

19      A.   The old manager brought her back upstairs

20   to the admitting office, and she stayed up there

21   for, I don't know, a few months, and then she asked

24

1    my manager if she could go back down to X-ray

2    Registration, and he let her go back down.  So it

3    was only temporary.

4        Q.   Okay.  And who was your manager?

5        A.   Albert Maufer.

6        Q.   Albert --

7        A.   Maufer, M-A-U-F-E-R.

8        Q.   Okay.  Did he have any interaction with

9    Miss Claude?  When I say interaction, on a daily

10   basis?

11       A.   No.

12       Q.   Okay.  What, if any, training did

13   Miss Claude receive while she was under your

14   supervision to perform her job?

15       A.   She was trained when she was first hired.

16   It's on-the-job training from everything of

17   learning the system to, you know, the whole

18   registration.

19       Q.   What, if any, difference was there

20   between the registration downstairs and where she

21   was transferred temporarily?  That is the process

25

1    or procedures.

2        A.    It's very similar.  You know,

3    registration is basically the same thing whether

4    it's for an X-ray or emergency room.

5        Q.    Okay.  Did there come a time when she was

6    transferred permanently to a registration position

7    in another department, to your knowledge?

8        A.    Yes, but I don't remember what year it

9    was, I mean, what month or anything it was.

10        Q.    Okay.  But she was transferred from under

11    your supervision?

12        A.    Correct.

13        Q.    Into that new department, and then she

14    became supervised by Mr. Shuttelly; is that

15    correct?

16        A.    Yes.

17        Q.    Now, how long, to your knowledge, had Mr.

18    Shuttelly been employed with the Harbor Hospital by

19    the time Miss Claude came under his supervision?

20        A.    He's been employed with Harbor and

21    Medstar for probably about 10 years.

28

1     written warning?

2          A.   I don't remember back then.

3          Q.   Okay.  Was it your policy or was it the

4     company's policy or practice that before you could

5     issue a disciplinary action against an employee,

6     you had to go to personnel?

7          A.   I don't remember what it was back

8     then.  It's too long to remember.

9          Q.   What is it today?

10          A.   Today everything is handled through

11    personnel.

12          Q.   So you wouldn't have been able to issue a

13    first written warning today unless you went through

14    personnel?

15          A.   Correct.

16          Q.   What role, if any, would personnel have

17    followed?  Would you have to explain to them what

18    you wanted to do?

19          A.   Yes.

20          Q.   And they would say, would tell you

21    whether or not you could give her a first written

29

1    warning on that?

2        A.    Yes.

3        Q.    Was there a list of rules and regulations

4    concerning the correction?  Were there any written

5    rules and regulations that was given to the

6    employee to tell them what the rules were in the

7    workplace?

8        A.    All employees have an employee handbook

9    that goes over just about everything.

10        Q.    I see.  So that information would be

11    found in the handbook?

12        A.    Uh-huh.

13        Q.    Who is Bernice Bell?

14        A.    She is a supervisor that works in X-ray

15    Registration.

16        Q.    And was she -- she was a supervisor, as

17    well?

18        A.    Yes, but not at Registration.  She just

19    worked down in X-ray.

20        Q.    Did there come a time when you discovered

21    that Miss Claude was going to go out on leave for

44

1          Q.    Because of the patients' complaints while

2     she was under your supervision?

3          A.    Yes.

4          Q.    So then she was transferred from under

5     your supervision to someone else's supervision?

6          A.    No.  Actually, she was transferred up

7     still under my supervision to the admitting office,

8     and she worked up there probably about six months,

9     and then she asked the manager,

10    Mr. Maufer, if she could be transferred back down

11    X-ray Registration, at which time he said yes.

12         Q.    Okay.  Do you know why she asked to be

13    transferred back down?

14         A.    She -- as far as I know, she just really

15    liked working in X-ray Registration.

16         Q.    And was she committing any registration

17    errors down there?  There were patient complaints.

18    Was that while she was under your supervision?

19         A.    Yes.

20         Q.    And did you write her up about that?

21         A.    No.  That's when we made the decision to

45

1    transfer her upstairs.

2         Q.    And why was that?

3         A.    To be under closer supervision.

4         Q.    Okay.  And who was then supervising her?

5         A.    I was.

6         Q.    Okay.  So you closely supervised her at

7    that time?

8         A.    Uh-huh.

9         Q.    And during that period of time, you did

10   not issue any disciplinary actions against her?

11        A.    No.

12        Q.    Did anyone issue any disciplinary actions

13   against her?

14        A.    Not that I know of.

15        Q.    How did Miss Claude dress when she came

16   to work?

17        A.    Very professional.

18        Q.    Did the company or Harbor Hospital have

19   any problems with the way that she dressed?

20        A.    Not to my knowledge.

21        Q.    I'm sorry.  What is your address, ma'am?

*Al Betz & Associates, Inc.*
Maryland 410-875-3376
Washington, D.C. 202-265-0015

1          A.    Uh-huh.

2          Q.    -- in that performance evaluation;

3    correct?

4          A.    Correct.

5          Q.    He also took you through the 2000

6    evaluation, correct?  But he only took you through

7    the technical aspects of that evaluation and not

8    the behavioral; is that correct?

9          MR. RAMSEY:  You mean 2000?

10         Q.    The 1999 to 2000 evaluation.  And in the

11   technical aspect of that evaluation, she was

12   performing satisfactorily; is that correct?

13         A.    I think that's what it said.

14         Q.    Okay.  Let's see if we can find it.  Okay.

15   Here we go.  Yep.  He did not take you through the

16   behavioral aspect, though.  So, to go back --

17         A.    I thought that's what we did.

18         Q.    Yes.  And with respect to the customer

19   service focus, can you tell me again what score she

20   received in that?

21         A.    1.5.

49

1         Q.    And the reason that you gave her a 1.5?

2         A.    Was because of the customer satisfaction

3    complaints, surveys.

4         Q.    Okay.  Now, is this particular score and

5    this particular comment, is that a satisfactory job

6    performance on that aspect of her job?

7         A.    No, 1.5 wouldn't be.

8         Q.    Okay.  So in terms of the customer

9    service focus, at least, that was not being

10   performed satisfactorily?

11        A.    At that time.

12        Q.    The rest of the evaluation, however, it

13   was -- she performed -- let be back that up.  Strike

14   that.

15             And then again with problem solving,

16   decision making, also in the behavioral competency,

17   can you tell me what score she received there?

18        A.    1.5.

19        Q.    And the comment says, "Pat needs to work

20   on alternative solutions when presented with a

21   registration problem."  Can you tell me whether

50

1    that score is a satisfactory according to the

2    hospital?

3        A.    1.5 is below.

4        Q.    Okay.  So in those two areas, was she

5    performing satisfactorily?

6        A.    Not at that time.

7        Q.    Okay.  The rest of the evaluation,

8    however, was she performing satisfactorily?

9        A.    Uh-huh.

10       Q.    Thank you.  I also wanted to ask you

11   about the situation when Miss Claude was

12   transferred to Mr. Shuttelly's supervision.  Can

13   you tell us whether she received a new position at

14   that point or whether it was her department or her

15   area was transferred to his supervision?  Can you

16   just clarify that for us?

17       A.    It wasn't a new job.  I mean, she was

18   just brought from X-ray Registration to the

19   Admitting.

20       Q.    No, no.  Excuse me.  Backup for a minute.

21   I'm talking about when the supervision of Pat

51

1       Claude was transferred from you to

2       Mr. Shuttelly.

3               A.    Oh, okay.

4               Q.    Can you just tell us how that came about?

5               A.    Mr. Shuttelly had insurance verification,

6       which they lost, because they went to the Central

7       Business Office.  So they thought it would be a

8       good idea to have, you know, everybody that was out

9       in the Admitting Office combined, Admitting and

10      Private Outpatient.  So that's how she came to come

11      upstairs.

12              Q.    Okay.

13              A.    And then I was strictly Emergency Room

14      Registration and Charts, Emergency Room Chart

15      Review.

16              Q.    Okay.  So, just to clarify, there was a

17      reorganization?

18              A.    Kind of like a reorganization.

19              Q.    Okay.  And at that point she was

20      transferred to Mr. Shuttelly's supervision?

21              A.    Right.