COPY

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3     PATRICIA CLAUDE              *

4          Plaintiff             *

5     vs.                         *   CASE NO.: JFM022511

6     HARBOR HOSPITAL CENTER,  *

7     ET AL                       *

8          Defendant             *

9     *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

10          The deposition of **MARY DARLENE LAWYER**,

11    was taken on Monday, May 12, 2003, commencing at

12    9:23 a.m., at 2122 Maryland Avenue, Baltimore,

13    Maryland, before Delcia Jones, Notary Public.

14    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

15

16

17

18

19

20    REPORTED BY:

21    D. JONES

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888     Fax (410) 821-4889

6

1          Q.   So during the period of time that Pat

2     Claude was employed at the hospital, you were

3     involved in disciplinary actions; is that

4     correct?

5          A.   Yes.

6          Q.   Did there come a time when you were

7     involved in a disciplinary action against Ms. Pat

8     Claude?

9          A.   Yes.

10         Q.   Can you tell us when that was?

11         A.   The supervisors actually handle the

12    actual disciplinary action.  They will come to HR

13    beforehand to say this is what happened, this is

14    the action that we want to take, you know, are we

15    within policy, are we following policy

16    correctly.  Then that is how we get involved.

17         Q.   When you say policy, is there a written

18    policy that they must follow or you must follow

19    when netting out disciplinary actions?

20         A.   Well, we have a number of policies, Code

21    of Conduct, Corrective Action Policy, Standards

7

1    of Behavior.

2         Q.   Code of conduct.  What else?

3         A.   Corrective Action Policy and Standards

4    of Behavior is sort of a guideline for managers

5    to go by.

6         Q.   Where would the Code of Conduct be

7    contained?

8         A.   It's in our policy manual for the

9    hospital, it's on line.  So managers have it

10   either way, hard copy or on line.

11        Q.   You say it's on line.  When you say it's

12   on line is it accessible by the public or by

13   hospital employees?

14        A.   It's MedStar's intranet.

15        Q.   So it's internal?

16        A.   Yes.

17        Q.   Do employees have access to this?

18        A.   Yes.

19        Q.   Would Ms. Claude have had access to

20   this?

21        A.   I don't see why not.  Sure.

9

1    are you looking for?

2        Q.   Actually, I'm looking for the Code of

3    Conduct, which is labeled.  So let's look at that

4    for a minute.  Let's look at that in connection

5    with any disciplinary action that would have been

6    taken against Ms. Claude, if you can recall.  Can

7    you tell us what is contained in that Code of

8    Conduct that she violated?

9        A.   No.  I mean, we issue a copy of this to

10   all the employees just for them to read over, so

11   they are familiar with the Code of Conduct for

12   MedStar and Harbor Hospital.

13       Q.   Is there a list of conduct or rules or

14   regulations that governs the conduct of the

15   employee?

16       A.   Yes.

17       Q.   May I see that document, please?

18       A.   You want me to find it in here?

19       Q.   Yes, ma'am.  I want you to point out to

20   me where the rules and regulations are.

21       A.   There is a sentence somewhere to the

10

1    effect that all employees are expected to conduct

2    themselves in a -- this is going to take a

3    minute.  I'm not a speed reader.

4        Q.   Well, you can take your time.

5        A.   I think the whole book, itself, goes

6    over the way we're supposed to conduct ourselves.

7        Q.   Is that Code of Conduct given to the

8    employees?

9        A.   Yes.

10       Q.   Along with a Handbook?

11       A.   Yes.

12       Q.   What is the difference between the

13   Handbook and the code of Conduct?

14       A.   I think the Handbook is more specific

15   toward Harbor Hospital, and more specific toward

16   individual employees. This is like a broader

17   overview of MedStar.

18       Q.   Is that a document that you consult when

19   a supervisor comes to you, or came to you, for

20   purposes of disciplining an employee?

21       A.   Not so much the Code of conduct unless

1    it were an issue of like fraud or something like

2    that.  For disciplinary action, I would first

3    refer to the policy manual, and then if employees

4    have questions, we can always say something to

5    the effect that if you'll recall in the Employee

6    Handbook, then we'll go over it with them.

7        Q.  So may I see the Code of Conduct?  Ms.

8    Claude was never involved in any type of criminal

9    fraud while she was employed?

10       A.  Not that I know of, no.

11       Q.  I see that there is, on page 27 of this

12   Code of Conduct, that this is a section that says

13   protection From Retaliation.  What does that

14   section mean?

15       A.  This is showing employees that there is

16   a policy in place, to assure them that they would

17   not be retaliated for reporting anything,

18   anything that they reported in good faith and

19   believing that they were being harassed or

20   anything like that.

21       Q.  How did your company go about enforcing

13

1    employee that they were being retaliated against

2    by a supervisor?

3        A.   Yes.   Pat Claude mentioned that, that

4    she was -- that some of the disciplinary actions

5    that were issued against her were in retaliation

6    for her reporting a patient complaint, or her

7    perspective of that patient complaint.

8        Q.   And what investigation did the hospital

9    conduct?

10       A.   Again, we spoke to the supervisor, the

11   supervisor's manager.   The manager spoke to the

12   patient that made whatever complaints.   We tried

13   to be very thorough in everyone that we talk to

14   that had anything to do with anything, whether it

15   be a patient complaint or anything else.

16       Q.   How do you conclude who to believe in a

17   situation such as where the patient complains and

18   the registrar disagrees and says I didn't do

19   that?

20       A.   Well, I think you have to take

21   circumstances and history, if you will, into

1    that patient concerning racism, or her attitude

2    toward Ms. Claude?

3        A.   The patient was spoken to.  I don't

4    believe-- I wasn't there so I can't say for sure,

5    but I don't believe that was even brought up.

6        Q.   Did you ever have any conversations with

7    Pat Claude concerning her surgery?

8        A.   I knew that she was going to go out for

9    a surgery, go out of work.

10        Q.   And did you ever speak to her about

11    that?

12        A.   Before she went out for her surgery, she

13    came to our office because she had, I always get

14    dates and times confused, but she had been given

15    a corrective action, and came to our office, HR,

16    before her surgery, and I told her to take her

17    time, go home, think about, you know -- give

18    herself time to recuperate, and then when she had

19    time, to give me a call if she was still--

20    because she was upset about a corrective action

21    that she had been issued.

18

1      Q.   I understand from Ms. Claude that

2  someone told her that they had, that is, Harbor

3  Hospital had intended to fire her, but they were

4  going to wait until after the surgery because

5  they didn't want her to go into surgery with that

6  on her mind.

7      A.   That is incorrect.  What Pat said to me

8  was that Tim was trying to get rid of her.  And

9  then I said Pat, that not true, you know.  If

10  that was the case, really, by as many patient

11  complaints that we had in such a short period of

12  time, your supervisor could have terminated you,

13  and he did not.  He's not trying to get rid of

14  you.  That was what I said to her.

15      Q.   Can you explain to me the steps in your

16  disciplinary procedure at the time that Pat

17  Claude was employed there?

18      A.   The steps?

19      Q.   I understand that you may have had a

20  progressive disciplinary procedure.

21      A.   Yes, we do.

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

1      Q.   Is that progressive procedure contained

2  in any of the documents that we have here today?

3      A.   The Corrective Action Policy.

4      Q.   Okay.  Are you able to point that out to

5  me in any of these documents, please?

6      A.   Sure.  It's in here.  Here this spells

7  it out in the Corrective Action Policy.  There are

8  progressive steps, but we can't always follow

9  them to the T.  It depends on circumstance and

10  nature and severity of it.

11      Q.   Were you always supposed to follow the

12  steps in the disciplinary procedure?

13      A.   No, sir.  That's what I was saying.  We

14  have a guideline to go by, but you can't always

15  follow that to the letter due to different

16  circumstances.

17      Q.   How long does a disciplinary action

18  remain in an employee's file?

19      A.   A written, like first written corrective

20  action would stay in there for a

21  year.  A final written one could be up to two

25

Q.  Then she was absent and she received a warning on that, right?  That was a verbal warning?

A.  Yes.  They are absences.

Q.  Right.  And then on 4/22/02 she received another first written warning.  It is your testimony today that you believe that the 11/9/2001 errors were not the same as the 4/22/02?

A.  They are certainly still not following proper procedure.

Q.  Would it be a fair statement that the supervisor may exercise their discretion as to whether or not a person receives a first written warning, or what step of the disciplinary procedure would be followed?

A.  To some extent their perception of how hard the employee is trying, their attitude towards an error.  I happen to know, I'm familiar with Shamira, and she would be devastated by any error that she made and would try really hard to

27

1      Q.   So you're saying that absences and

2   lateness is treated completely different from

3   each other?

4      A.   Yes.

5      Q.   How many disciplinary actions can one

6   receive concerning tardiness and absence before

7   they are fired?

8      A.   It should be verbal, then first written,

9   and then final written, and then termination.  As

10  I said earlier, even though we have these

11  guidelines in place sometimes there are

12  extenuating circumstances, and we can't always

13  follow that to the T.

14     Q.   Who exercises the discretion as to

15  whether or not it would be followed to the T?

16  Would it be Human Resources, or would it be the

17  immediate supervisor?

18     A.   It could be a combination.

19     Q.   How much weight does the supervisor's

20  decision, opinion, recommendations carry in terms

21  of what type of disciplinary action would be

34

1      A.  There were two patient information

2   errors in a very short period of time, almost

3   back to back, that lead up to her termination.

4      Q.  Was it those two problems that caused

5   her termination, or was there something else that

6   caused her termination along with that?

7      A.  No.  That was it.  That was pretty much

8   it.

9      Q.  I just want to make sure that other

10  information contained in her personnel file was

11  not used.

12     A.  Such as.

13     Q.  Well, let's see here.  I've read some

14  memo that talks about issues with regard to her

15  allegedly being away from her desk, and some

16  other issues.  Was that considered?

17     A.  I'm sure an overall view of the file,

18  I'm going to say yes.  I believe that would have

19  played a role in it.

20     Q.  Do you recall having reviewed that

21  information for purposes of making a decision to

35

1    terminate her?

2    A.   No. She was terminated on the basis of

3    the patient information error.

4    Q.   Okay.  I don't understand, then, and I

5    just want to get some clarity when you said I

6    think the overall would have been considered but

7    she was terminated for the two errors.  Was she

8    terminated because of her overall past history,

9    along with the two errors, or was she terminated

10   because of the two errors?

11   A.   I'm sure that a number of patient

12   complaints and employee surveys, negative

13   employee surveys, yes.  I was familiar with her

14   file, but the reason that she was terminated was

15   for the patient information errors.

16   Q.   Well, when the judge looks at this for

17   the reasons that she was terminated, or I present

18   this to a jury, if I got that far, I want to be

19   able to specifically say why she was terminated.

20   I'm not sure that I've gotten the correct answer,

21   although you're trying.  But I understand that

37

1  went and saw my supervisor, who was then Dawn

2  Hoffman, and talked about it, yes, and the

3  decision was made to terminate her.

4      Q.  Have you ever heard that Pat Claude

5  complained about Tim Shetterly asking her whether

6  or not, and I don't think I have all these words

7  correct, but the thought is correct, whether or

8  not due to the age difference between her and her

9  husband, whether or not he could really make love

10  to her?

11      A.  No.

12      Q.  Did she ever complain to anyone that

13  Shetterly had asked her if she knew drug dealers?

14      A.  No.

15      Q.  If you were African American and someone

16  approached you and asked you if you knew drug

17  dealers, how would you feel about that?

18          MS. ONG:  Objection.  Relevance.

19      Q.  How would you feel about that?

20          MS. ROWINSKI:  You can answer.

21      Q.  I guess you don't know because you're

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

1    not African American; right?

2        A.  I don't know.  I'd be insulted in any

3    case if someone asked me something like that.

4        Q.  If someone asked you whether or not you

5    and your husband could make love because of your

6    husband's problem or age or something, would you

7    be insulted?

8            MS. ONG:  Objection.  You can answer.

9        A.  Yes, because it would be horrible.

10       Q.  Was there anything good about Ms.

11   Claude's work habits that you saw prior to her

12   termination?

13       A.  She was very punctual, and from what I

14   understand from her record, very rarely missed

15   any time from work.

16       Q.  Where are the client survey sheets

17   placed in the hospital?  What I'm asking you is

18   whether or not it's accessible to patients who

19   are registering or, whatever, at the hospital?

20       A.  I'm sorry.  Can you ask me again?

21       Q.  Yes, ma'am.  I understand that there are

40

1          A.   No.  It was on the Radiology Department.

2          Q.   What department was Ms. Claude in when

3     she was terminated?

4          A.   In the same department she had always

5     worked in, Admitting.  She was stationed in the

6     Imaging Department for a number of years.

7          Q.   I guess what I'm trying to find out is

8     whether or not in any of the patient surveys

9     other registrars or other employees were

10    complained of other than Ms. Claude?

11         A.   I'm going to say no, because that is

12    where Pat Claude was stationed when they were

13    issuing the patient surveys, and I didn't see

14    them until recently, but I'm assuming when they

15    came through from the patient -- after the

16    patient left the Registration Department and, you

17    know, deposited their survey, Pat was the one

18    that was working.  I don't know if I said that

19    right.  I'm sorry.  I'm a little nervous.

20         Q.   When you say Pat was the one that was

21    working, it raises an issue in my mind that those

46

1  conducted of other employees within that

2  department other than Ms. Claude.  Is that a fair

3  statement?  You said, for example, technicians

4  may have been rated, et cetera.

5     A.  Right.

6     Q.  Did you have any hand in preparing that

7  form that was used?

8     A.  No.  And just to share with you, those

9  patient surveys were not even an issue.  They

10  were not even considered.  They were not even

11  considered.  The only thing that I-- I heard

12  about them after we had gotten patient

13  complaints. The patient complaints and patient

14  surveys were two entirely different things.

15     Q.  That's what I wanted to be clear about,

16  was the reasons for her termination.  And the

17  labeling was the reason for her termination, and

18  not any of the complaints made by patients.

19     A.  The patient complaints, as I said

20  before, her overall file was taken into

21  consideration, so we already had a number of

47

1    complaints that, even though they were not --

2    they did not have anything to do with patient

3    information errors, they were still in her file,

4    still part of her file.  But they were not the

5    reason that she was terminated.

6         Q.  But you considered it.  Is this a fair

7    statement?

8         A.  Well, if I said I did not know anything

9    about it, I wouldn't be telling the truth.

10        Q.  I'm not asking you as to whether or not

11   you knew anything about it.  The question is

12   whether or not those things were taken into

13   consideration in making a determination to

14   terminate her.

15             MS. ONG:  Objection.  Asked and

16   answered.

17             MR. RAMSEY:  I'm not sure that I did

18   get the answer.  I'm not sure whether it was or

19   not.

20             MS. ONG:  You've asked the question

21   several times.  Just because she hasn't given you

1    the answer that you want -- she's tried to answer

2    it to the best of her ability.  She's just not

3    giving you the one that you want.

4              MR. RAMSEY:  Let's go off the record.

5              (DISCUSSION OFF THE RECORD)

6         Q.  I'm going to ask you this question one

7    final time so that I understand it.  I believe it

8    was your testimony that the reason she was

9    terminated was because of mislabeling.

10        A.  Correct.

11        Q.  I believe it was your testimony that

12   nothing else was considered in making the

13   decision to terminate her.  Is that a correct

14   statement?

15        A.  No.  The patient complaints, I knew of

16   them, yes.  I mean, it was part of her file.

17        Q.  So you reviewed her complete file.  So

18   it wasn't just the labeling errors that caused

19   her termination, it was the labeling errors in

20   connection with her overall performance, her

21   overall disciplinary--

49

1    A.  No, sir.  She was terminated for the

2    labeling errors.

3    Q.  Okay.  My next question was why didn't

4    you consider the entire file of Ms. Cook in terms

5    of the types of disciplinary actions that were

6    being issued?  I know that they were separate,

7    that is, attendance, absence, mislabeling, et

8    cetera. But in issuing the disciplinary action

9    for Ms. Cooke, her complete personnel file was

10   not considered, would that be a fair statement,

11   other than the absence and the lateness?

12   A.  I hope I'm not going to misspeak here,

13   but I have to say this.  Pat was employed with us

14   for 15 years, and she was doing the job for a

15   number of years.  I would think that someone,

16   after so many years doing the same --

17   Q.  I don't mean to interrupt you, but I

18   asked you a specific question, and I'm sure that

19   you'll give that particular answer to some other

20   question.  But the question was whether or not

21   you reviewed the overall personnel file of Ms.