COPY

1

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MARYLAND

3   PATRICIA CLAUDE          *

4          Plaintiff        *

5   vs.                      *   CASE NO.: JFM022511

6   HARBOR HOSPITAL CENTER,  *

7   ET AL                    *

8          Defendant         *

9   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10      The deposition of **DAWN C. HOFFMAN**, was

11   taken on Monday, May 12, 2003, commencing at

12   10:50 a.m., at 2122 Maryland Avenue, Baltimore,

13   Maryland, before Delcia Jones, Notary Public.

14   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20   REPORTED BY:

21   D. JONES

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888     Fax (410) 821-4889

8

1    complaints, concerning Shetterly?

2        A.   Yes.

3        Q.   And what was the substance of that

4    conversation?

5        A.   She came to me at some point in

6    November, Darlene came to me at some point in

7    November, to say that Pat Claude had been to see

8    her and was not happy with the -- I guess she had

9    a first written warning at that point, and felt

10   that Tim was out to get her, that he was watching

11   her, and that she was getting write-ups.

12       Q.   And what, if anything, did you do as a

13   result of that conversation with Ms. Lawyer?

14       A.   Darlene then went into details showing

15   me the various patient complaints and the

16   write-ups, and the times that there had been

17   complaints before she had been written up, and

18   then there had been the verbal, and then had been

19   the first written.  We talked about verifying

20   that the complaints had taken place.  I verified

21   that the corrective action appeared appropriate

14

1          A.   In preparation for the position

2     statement.

3          Q.   Were you the one would approved Pat

4     Claude's termination?

5          A.   I'm only hesitant as I'm not sure the

6     word approved is correct.

7          Q.   Let me just put it this way.

8          A.   Confirmed it.

9          Q.   Were you final arbiter?

10         A.   Yes.

11         Q.   Do you recall what was taken into

12    consideration in making the decision to terminate

13    Ms. Claude?

14         A.   A number of factors.  From my

15    standpoint, I always start with the policy, we

16    have a Standards of Behavior Policy, and it lists

17    a number of infractions, or problems by an

18    employee, and it starts out with various levels

19    of verbal, first written, final written,

20    suspension, always with a caveat that that is not

21    cast in stone, that you can look at the nature

16

1    mislabeling, I think that is what Ms. Claude was

2    terminated for, you don't have to follow the

3    steps in the procedure because of the seriousness

4    of the violation?

5        A.   The way the policy is written, you take

6    into account nature and severity, you can also

7    take into account previous corrective actions,

8    you look at mitigating circumstances.  It's not

9    cast in stone.  That is a starting point, and

10   then you can go up or down based on the actual

11   events.

12       Q.   Do you recall any infraction that would

13   cause an employee to be immediately terminated?

14       A.   There are a number of them.  Physical,

15   fighting, threat to a patient or fellow employee,

16   that would be without any prior incident

17   happening.  Those could all lead to immediate

18   termination.  Theft, particularly coming from the

19   patient.  A lot of it is patient related and is

20   safety related when there is immediate

21   termination.  And actually what we do is we

1    tardiness, and we keep absence and tardiness

2    separate from any other type of corrective

3    action.  They follow their own line.

4         Q.   Do you know Ms. Gitten, G-I-T-T-E-N?

5         A.   I do not know her, no.  I know she was

6    an employee at Harbor Hospital.

7         Q.   I'm going to show you a disciplinary

8    action, I believe, that was taken against her on

9    4/22/02, and ask you to take a look at that.

10        A.   Okay.

11        Q.   She received what there?

12        A.   She received a first written warning.

13        Q.   Would you read into the record what

14   infraction she committed?

15        A.   On Friday April 19, 2002, you passed PAT

16   testing paperwork to Judy Spellman, PA.  Do you

17   want me to give the patient --

18        Q.   No.

19        A.   The poster that you passed to Judy for

20   Dembicki had account number, that was for another

21   patient Gregory.  The poster was sent to the

21

1  laboratory with a blood specimen, thus resulting

2  in the laboratory having a poster for a patient

3  that was incorrectly labeled.  Due to the

4  severity of the incident, you are being given a

5  first written warning, under Section 20.3.2.7,

6  negligent performance of duties, of the Human

7  Resources Employee Policies and Procedures.

8  Immediate improvement is expected.

9       Q.  What would have been the next step in

10  the disciplinary procedure for her after that

11  one?

12       A.  Generally, if this employee had

13  performed the same error, it would either be --

14  well, generally, the policy would call for

15  termination, then we would look at if there were

16  any mitigating factors.

17       Q.  I noticed in looking at Ms. Cook, Ms.

18  Gitten and Ms. Claude, personnel actions taken

19  against them, and it seems that they are bunched

20  up, to an extent, about mislabeling in April of

21  2002.  Did that ever come to your attention?

CRC-SALOMON
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

23

1    you know what the date might have been?

2         A.   I don't remember the exact date, no.

3         Q.   Would there be anything else in this

4    file that might reflect the date?

5         A.   Not in this file.  This is actually the

6    step two document there.  No.  What I can tell

7    you is that it was after the termination and

8    prior to the second level grievance which was

9    heard on 4/30.

10        Q.   So she was not in your employ at the

11   time?

12        A.   That is correct.

13        Q.   What did you take into consideration in

14   making the decision to terminate Ms. Claude?

15        A.   There was an error for failure to

16   register a patient properly sometime in March,

17   within, I believe it was within days after that

18   period of time was the first labeling error.  At

19   that point when, I believe, Pat was suspended,

20   and we went to great -- the department went to

21   great care to tell her about paying attention to

24

1    detail, how critical it is for the labeling

2    issue.  There is a shared printer that a number

3    of people in the department use, so you can't

4    just go back and simply pull off the set of

5    labels that are setting at the printer.  You have

6    to verify either patient name or patient

7    identification number.  And then less than a

8    month later, I believe about three weeks later,

9    that same error was made again, so that would

10   normally be the termination.

11          I remember looking at volumes for the

12   day to see if it was a heavy volume.  Pat had

13   made a comment that one of the first errors she

14   made was a very busy day and she was staffing for

15   lunch and things were hectic.  We looked at the

16   volume on the date of the second labeling error,

17   and it was less than half of what it normally is,

18   so it certainly was not a hectic pace.  It was no

19   reason for that.  Pat offered no explanation.

20   She actually made a complaint, what can I say,

21   there are a lot of labels back there.  And,

25

1    although, she had just three weeks prior been

2    given instructions about paying attention to

3    always match a number and a name, she did not do

4    that.  Because those were two very serious

5    patient safety issues.

6            The first issue was the HMO patient

7    cost the hospital revenue.  It's not actually a

8    patient safety issue, but it is certainly an

9    error, losing revenue, and that is an error in

10   paying inattention to detail, not registering

11   someone properly, not following through on the

12   form.  But the other two are patient labeling

13   errors.  Those are patient safety.  We take that

14   extremely seriously. In fact, the two of them

15   identical happening almost three weeks apart was

16   the decision for termination.

17       Q.  Can you look at Ms. Cook's disciplinary

18   action and tell us whether or not this could have

19   resulted in, or did result in loss of money or

20   loss of revenue, number one, and number two,

21   which disciplinary action could have involved the