# COPY

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MARYLAND

3    PATRICIA CLAUDE            *

4            Plaintiff    *

5    vs.                       *   Case No. JFM-022511

6    HARBOR HOSPITAL CENTER *

7            Defendant     *

8    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

9          Deposition of **TIMOTHY A. SHETTERLY** was

10   taken on Monday, May 5, 2003, commencing at 10:28

11   a.m., at the Law Offices of Shawe & Rosenthal,

12   20 South Charles Street, 11th Floor, Baltimore,

13   Maryland, before Abraham Weinapple, Notary

14   Public.

15   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

16

17

18

19

20   REPORTED BY:

21   A. WEINAPPLE


            COURT REPORTING CONCEPTS, INC.
                Baltimore, Maryland
        Phone (410) 821-4888    Fax (410) 821-4889

9

1       Q.     Let's talk about the first time that

2    you disciplined Ms. Claude.  When was that?

3       A.     October 17th.

4       Q.     Of which year?

5       A.     2001.

6       Q.     And what was the occasion that caused

7    you to discipline her?

8       A.     It was a complaint from a mother of a

9    patient.

10      Q.     What type of complaint was it?

11      A.     She complained that Pat was rude and

12   argumentative over whether a referral was

13   required for services.

14      Q.     And did she complain directly to you,

15   that is, the patient?

16      A.     No.

17      Q.     How did you learn of the situation?

18      A.     Through the director of the

19   department.

20      Q.     And who was that?

21      A.     James Clement.

10

1    Q.    And what, if anything, did Mr. Clement

2  say to you concerning Ms. Claude and the

3  complaint?

4    A.    Can you repeat that?

5    Q.    Yes.  What did Mr. Clement say to you

6  about Ms. Pat Claude and complaints that was

7  being lodged?

8    A.    I don't recall.

9    Q.    That document doesn't refresh your

10  recollection?

11    A.    Not the conversation that I had with

12  him.

13    Q.    What, if anything, does that document

14  help refresh your memory concerning the actions

15  that you took against Ms. Claude?

16    A.    That on October 17th I gave her a

17  verbal warning.

18    Q.    Had you investigated the incident?

19    A.    I talked to the patient's mother.

20    Q.    You talked to the patient's mother?

21    A.    Uh-huh.

COURT REPORTING CONCEPTS, INC.
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

11

1    Q.    How did she know whose patient it was?

2    A.    From Mr. Clement.

3    Q.    From Mr. Clement.  Had Mr. Clement

4    talked to the patient?

5    A.    I don't know.  I can't answer that.

6    Q.    How long a conversation did you have

7    with the patient?

8    A.    I can't recall.

9    Q.    Did you talk to the patient in person

10   or by phone?

11   A.    In person.

12   Q.    Did you talk to that patient by phone?

13   A.    I talked to the patient's mother in

14   person; the patient, I believe, was a pediatric

15   patient.

16   Q.    You talked to the mother by phone?

17   A.    In person.

18   Q.    I'm sorry?

19   A.    In person.

20   Q.    In person.  Did you ask the mother to

21   come back to the hospital so that you could speak

13

1      Q.    You can't recall.  Did you make any

2    notes?

3      A.    No, I did not.

4      Q.    So there's nothing in the file that

5    would reflect facts showing how she was rude,

6    would that be a fair statement, other than the

7    patient's complaint?

8      A.    Can you repeat that?

9      Q.    Yes.  You made no written notations

10    concerning a conversation that you had with the

11    patient's mother?

12      A.    No.

13      Q.    So anything that's reflected in

14    Ms. Claude's Personnel File concerning that

15    incident is based upon your memory, based upon

16    your conversations with the mother?

17      A.    Correct.

18      Q.    Did you speak to Pat Claude after you

19    had interviewed the mother?

20      A.    Yes.

21      Q.    Did you speak to her separate and

14

1    apart from the mother?

2        A.    Yes.

3        Q.    What, if anything, did you say to Pat

4    Claude about that interview with the mother?

5        A.    I don't recall.

6        Q.    Did you make the assumptions, based

7    upon your interview with regard to the mother,

8    that Pat Claude had committed an infraction?

9        A.    Can you repeat that?

10        Q.    Did you make the decision that Pat

11    Claude had committed an infraction based upon

12    your interview with the patient?

13        A.    Yes.

14        Q.    What rule or regulation, if any, and

15    you can look at the documents, was there

16    specifically stating what type of disciplinary

17    action should be given to Pat Claude for this

18    incident?

19        A.    Can you repeat that?

20        Q.    Yes, sir.  You said you gave her a

21    First Written Warning; is that correct?

15

1          A.    No.  It was a verbal warning.

2          Q.    A verbal warning.  What criteria did

3    you use to determine whether or not you should

4    give her a verbal warning?

5          A.    There was a similar complaint on

6    October 15th.

7          Q.    Is your answer that the criteria that

8    you used for purposes of giving her a verbal was

9    whether or not she had had any other infractions?

10         A.    No.

11         Q.    Well, what criteria did you use?

12         A.    Poor customer service.

13         Q.    Do you know what I mean when I say

14   "criteria"?

15         A.    Yes.

16         Q.    Would tell us what you think I meant?

17         A.    (No response).

18         Q.    Let me put it to you this way.  You

19   have a BS degree in what, marketing or business

20   or management?

21         A.    Business Management.


COURT REPORTING CONCEPTS, INC.
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

16

1    Q.    Business Management.  Did you ever

2  have any courses in psychology and testing?

3    A.    Yes, I did.

4    Q.    Okay.  Would you agree that when

5  you're performing tests that there are certain

6  guidelines or criteria or objective standards by

7  which you may measure or test a person?

8    A.    Yes.

9    Q.    And so when I say "what criteria did

10  you use", I'm asking you about what objective

11  standards or factors you used to make a

12  determination that she should be given a verbal

13  warning for poor customer service?

14    A.    One would be training, and the second

15  was the continued bad customer service.

16    Q.    So in issuing that disciplinary action

17  you considered Ms. Claude's training?

18    A.    Yes.

19    Q.    What about training that you

20  considered?

21    A.    For this disciplinary action I

17

1    considered that she was rude and argumentative,

2    and this was the second one within a few day

3    period.

4         Q.    You said training was a criteria that

5    you used, and I'm asking you about the training.

6    What about training?  Was it that she refused to

7    go to training, that she did not have training?

8    Why did you say training was a criteria?

9         A.    She didn't follow her proper training.

10        Q.    She didn't follow her proper training.

11   How much training did she receive when she went

12   into that particular position when she came under

13   your supervision?

14        A.    There were two customer service

15   sessions that she went to.

16        Q.    And how long did that last?

17        A.    I don't recall the exact time.

18        Q.    You don't remember how long it lasted.

19   And was --

20        A.    As far as hours no, I don't.

21        Q.    Was it a half-a-day, one day, a week?

29

1      Was she mistaken in terms of the date?

2         A.     I don't recall that incident.

3         Q.     But you're looking now at the October

4      15th incident, 2001?

5         A.     October 15, 2001 was a verbal.

6         Q.     Was a verbal warning?

7         A.     It was not a warning.  I gave a

8      counseling session.

9         Q.     Counseling session.  Now, why did that

10     occur?  I mean, what was the complaint?

11        A.     It was a mother and grandmother of a

12     patient lodging a complaint.

13        Q.     And what was the complaint?

14        A.     That Ms. Claude seemed angry and rude

15     during her registration, during the registration

16     process.

17        Q.     Did they say what she said that made

18     it seem that she was angry?

19        A.     I don't recall.

20        Q.     Did you interview the mother and the

21     grandmother?

30

1        A.    Yes.

2        Q.    You don't recall what they said?

3        A.    No.

4        Q.    You did not make any written

5   documentation or notes concerning your

6   conversations with these individuals?

7        A.    No.

8        Q.    How did you know whether or not their

9   version was true versus Ms. Claude's version,

10  that is, if Ms. Claude gave you a version?

11       A.    I don't.

12       Q.    But you believed the patients versus

13  Ms. Claude; is that correct?

14       A.    (No response).

15       Q.    Are you waiting for a question, or are

16  you thinking about your answer?

17       A.    I'm thinking about the answer.

18            MR. RAMSEY: I just want to let the

19  record reflect that whenever I ask a question the

20  deponent takes a significant period of time

21  before answering the questions, then he asks to

32

1    question?

2         A.    I've been looking over both of them,

3    jumping back and forth.

4         Q.    So what is it about that particular

5    document that refreshes your recollection?

6         A.    That it was a verbal counseling

7    session, not a verbal warning.

8         Q.    I'm sorry, sir?

9         A.    That is a verbal counseling session.

10   It was not a verbal warning as in October 17th.

11        Q.    And does that document reflect that

12   you interviewed the mother and the grandmother

13   concerning that incident?

14        A.    It says that, the document that I'm

15   looking on the 15th, the mother and grandmother

16   lodged a complaint.

17        Q.    Okay.  My question was whether or not

18   it reflects whether or not you interviewed the

19   mother and grandmother?

20             MS. ONG: Objection.  He previously

21   stated that he did.

34

1       A.      No.

2       Q.      Do you have a memory problem?

3       A.      No, not that I'm aware of.

4       Q.      Okay.  Now, what version, if any, did

5    Ms. Claude give you concerning the first incident

6    for which you had a verbal counseling with her?

7       A.      From what I can recall, she denied the

8    complaint.

9       Q.      She denied the complaints?

10      A.      (Indicating yes).

11      Q.      What made you believe the mother and

12   grandmother versus Ms. Claude?

13      A.      (No response).

14      Q.      Are you reading the documents now to

15   determine the answer to the question?

16      A.      I'm reading the documents trying to

17   refresh my memory.

18      Q.      What portion of the document are you

19   reading to refresh your recollection?

20      A.      The incident of October 15th.

21      Q.      And that's one paragraph, isn't it?

37

1    face?  Is it the tone of a voice?

2          A.    It could be.

3          Q.    Okay.

4          A.    It could be both.  It could be

5    yelling.

6          Q.    Did they say she was yelling?

7          A.    I don't recall the conversation.

8          Q.    Did they say that she was using curse

9    words?

10         A.    I don't recall that.

11         Q.    Did they say that she was loud?  They

12   said angry and rude here.

13         A.    I don't exactly remember.  I don't

14   recall the actual conversation that I had.

15         Q.    And you interviewed both the mother

16   and the grandmother; is that right?

17         A.    Correct.

18         Q.    Did you interview them on the date of

19   the incident?

20         A.    Yes.

21         Q.    How soon after they lodged the

COURT REPORTING CONCEPTS, INC.
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

39

1    her". And she said "she remembered this

2    particular patient and explained that Ms. Claude

3    was entirely professional in her interaction.

4    Ms. Claude was not disciplined for this

5    complaint, but she was transferred back to the

6    main Registration Area after consultation with

7    the Imaging Director, Joe Ziliox". Do you see

8    that?

9         A.    Yes.

10        Q.    Did you play any role in that?

11        A.    No.

12        Q.    No. Okay. I don't know if we've

13   already discussed the October 17th incident or

14   not. Can you read that paragraph and tell me

15   whether or not we have? It seems like the

16   October 15th incident. I don't want to go back

17   over the same territory.

18        A.    "On October 17 of 2001, the mother of

19   another patient complained to EKG manager that

20   Ms. Claude was rude and argumentative over

21   whether a referral was required or not. The

COURT REPORTING CONCEPTS, INC.
Baltimore, Maryland
Phone (410) 821-4888   Fax (410) 821-4889

40

1    patient's mother was upset by the interaction and

2    cited poor customer service by Ms. Claude.  As a

3    result, Mr. Shetterly issued a verbal warning to

4    Ms. Claude, attaching verbal warning October 17

5    of 2001."

6        Q.    Now, had you issued her any kind of

7    warnings before that?  I think you had had

8    counseling with her but not disciplined her, and

9    then there was something after that?

10       A.    October 15th was a verbal counseling.

11   October 17th was an actual discipline with a

12   verbal warning.

13       Q.    May I see that, please?  Again, did

14   you interview the mother?

15            MS. ONG: Mr. Ramsey, excuse me.  I

16   believe that we've already discussed the October

17   17th.  I think that was the first incident you

18   discussed, and then you jumped back to the

19   October 15th incident.

20            MR. RAMSEY: All right.  I'll skip

21   that.  Thank you very much.

41

1          Q.    Now, I believe you testified that you

2     were not aware of Ms. Claude lodging any

3     complaints with either Human Resources or anyone

4     else such as Debbie Gephart?  I'm sorry, sir.  I

5     was incorrect.  Patient made a formal complaint

6     to Human Resources, it wasn't Ms. Claude.  Can

7     you look at that paragraph, please, on November

8     2, 2001.

9          A.    Okay.

10         Q.    Did you interview that particular

11    patient?

12         A.    Yes.

13         Q.    How soon after the incident did you

14    interview -- was it a he, I believe?

15         A.    Yes.

16         Q.    How soon after the incident did you

17    interview him?

18         A.    He was still present in the hospital.

19         Q.    What, if anything, did you discuss

20    with this patient?

21         A.    The incident.

42

1       Q.    Did you discuss the incident with

2  Ms. Claude?

3       A.    Yes.

4       Q.    What was the nature of the discussion?

5       A.    There was a discussion about the

6  formal complaint that he lodged, where he had to

7  use his own telephone to make a call to his

8  physician's office.

9       Q.    Was there another telephone available

10  where he could have made a phone call within the

11  hospital without having to use his phone?

12       A.    Yes.

13       Q.    And where was that phone?

14       A.    In registration.

15       Q.    Was it Ms. Claude's phone, or was

16  there just a separate phone for patients to use?

17       A.    It's like a department phone.

18       Q.    And in a situation where a patient

19  needs to use a telephone, is the registrar

20  supposed to refer him over to that phone to make

21  a phone call?

44

1    to whether or not you did or did not?

2        A.    No.

3        Q.    Why don't you look at, I think this is

4    her Personnel File, at least that's what it says

5    on here, and see if you can find the evaluation,

6    if you did so?  Let's go off the record for a

7    minute.

8                            RECESS

9        Q.    You've taken a look at the fact that

10   you counseled Ms. Claude, I guess around November

11   27, 2001, for mid -- I wouldn't say that, but it

12   says "mid year evaluation", which to me would put

13   it around the sixth month.  Did you conduct such

14   an evaluation?

15       A.    Yes.  It's mid fiscal year, because in

16   the hospital we go by fiscal year.

17       Q.    Okay.  Was that a normal procedure, or

18   was Ms. Claude an exception?  Strike that.

19       A.    Normal procedure.

20       Q.    Normal.  So everybody was given a mid

21   term evaluation?

50

1          A.    If you're talking about these

2    particular surveys, they look like their from the

3    Imaging Department.

4          Q.    What makes you say that?

5          A.    It says Imaging Services on the top.

6          Q.    I see.  When you took this

7    disciplinary action against Ms. Claude, did you

8    consider any of those documents?

9          A.    No, I haven't.  I don't believe I ever

10   seen them.

11         Q.    So that didn't figure in your decision

12   to recommend your termination; is that correct?

13         A.    Correct.

14         Q.    And although you made the

15   recommendation for her termination, you did not

16   make the decision to terminate Ms. Claude; is

17   that a fair statement?

18         A.    Can you say that again?

19         Q.    Yes, sir.  I understand that

20   supervisors in your position would recommend to

21   personnel that certain disciplinary action should

51

1    be taken against an employee before it's taken;

2    is that a correct statement?

3         A.    Yes.

4         Q.    And so all the disciplinary action

5    that was taken against Ms. Claude, including her

6    termination, were recommendations that you made

7    to the Department of Personnel that should be

8    taken or approved before you took the action?

9         A.    Correct.

10        Q.    Now, who in personnel would you have

11   discussions with concerning termination of

12   Ms. Claude?

13        A.    Human Resources Generalist.

14        Q.    And who would that be?

15        A.    Darlene Lawyer.

16        Q.    Would there be any other persons

17   involved, such as Debbie Gephart or any other

18   person?

19        A.    My manager, who's Carol Lupinos.

20        Q.    So would you speak to them as a group,

21   or would you speak to them individually, that is,

52

1    your manager and then Human Resources, or does it

2    depend on the situation?

3        A.    I take my information to my manager

4    and we take it to Human Resources.

5        Q.    Did there come a time you learned that

6    Ms. Claude had to go out for surgery?

7        A.    Yes.

8        Q.    I understand from Answers to

9    Interrogatories that you delayed her termination

10   because you wanted to make sure she had whatever

11   benefits she should have had or would have had,

12   such as health benefits, which would have covered

13   her surgery.  Would that play a role in what

14   decisions that you made concerning her

15   termination?

16         MS. ONG: Objection to the

17   characterization as to delayed termination.  You

18   can answer if you understand the question.

19       A.    Can you repeat the question?

20       Q.    Yes.  To your knowledge, had there

21   been a decision made to terminate Ms. Claude

COURT REPORTING CONCEPTS, INC.
Baltimore, Maryland
Phone (410) 821-4888    Fax (410) 821-4889

53

1    before she went out for surgery?

2         A.    I believe she had a suspension for a

3    complaint before she went out for surgery.

4         Q.    I'm looking for your Answers to

5    Interrogatories.  Who is George Skidmore?  You

6    can say whether you know him or not.  You don't

7    know him?

8         A.    No, I don't.  Not that I can recall.

9         Q.    How about Leslie Hightower?  Do you

10    know Leslie Hightower?

11         A.    Yes.

12         Q.    Who is she?

13         A.    She works in Human Resources.  I

14    believe her official title may be secretary.  I'm

15    not positive or --

16         Q.    Did you have any conversations with

17    her concerning Ms. Claude?

18         A.    One of the complaints was given to me

19    from Leslie Hightower.

20         Q.    And what was that complaint?  Was that

21    when somebody had gone to Human Resources and

55

1    bottom of page 4 you talk about suspension,

2    that's page 4 of Plaintiff's exhibit.  Off the

3    record.

4                    (DISCUSSION OFF THE RECORD)

5        A.    Can you repeat that last question?

6        Q.    You said that there had been some

7    disciplinary action taken against Ms. Claude in

8    November and that she had been suspended; right?

9    And then I was asking you questions about her

10   termination, and whether or not the decision to

11   terminate her was delayed so that she would be

12   able to utilize her insurance and any other

13   benefits that she had for her surgery.

14       A.    Her termination wasn't delayed. You

15   said terminate her.  She was suspended.

16       Q.    And that was pending her termination?

17       A.    No, it was not pending termination.

18       Q.    Just suspension.  May I see the

19   document, please?  How do you account for

20   Ms. Claude making as many mistakes as she did

21   within the short period of time that she came